**CATHY'S TAP, INC., d/b/a Shooter's; Enc, Inc., d/b/a Shooter's Gentleman's Club, Plaintiff,**

**v.**

**VILLAGE OF MAPLETON, an Illinois Municipal Corporation; Ken Odewalt, individually and in his official capacity as Mayor and Liquor Control Commissioner of the Village of Mapleton; Carol Brockway; Larry Daily; Rich-**

ard Herold; Kevin Hess; Marshall Leaper; John Monks; and James Phillips, in their official capacities as members of the Liquor Control Commission of the Village of Mapleton, Defendants.

No. 98–1303.

United States District Court, C.D. Illinois.

Sept. 24, 1999.

John H. Bisbee, Law Office of John Bisbee, Bushnell, IL, for plaintiff.

James G. Sotos, Dana M. Shannon, Jason W. Rose, Melissa A. Miroballi, Hervas Sotos Condon & Bersani, Itasca, IL, for defendants.

## ORDER

MIHM, District Judge.

This matter is before the Court on Defendants' Motion to Dismiss Counts I, II, and IV of the Third Amended Complaint and Motion to Dismiss Count III of the Third Amended Complaint. For the reasons stated herein, the Motion to Dismiss Counts I, II, and IV is GRANTED IN PART and DENIED IN PART, and the Motion to Dismiss Count III is DENIED.

## I. Factual Background

Between April, 1996, and March 31, 1998, Plaintiff ("Cathy's Tap") did business as a retail liquor licensee in Mapleton, Illinois. In an attempt to diversify and expand its business, Cathy's Tap started doing business on or about April 1, 1998, as an adult entertainment or "adult cabaret" establishment, as subsequently defined by the Village of Mapleton. Cathy's Tap continued to serve alcoholic beverages pursuant to its previously issued liquor license and also provided "entertainment in the form of non-obscene live nude dancing by females." (Third Amended Complaint, ¶¶ 1–2).

On or about April 14, 1998, the Mapleton Board enacted Ordinance 98–02, which went into effect on June 9, 1998. According to Cathy's Tap, the Ordinance was enacted "either on [the Board's] own initiative or as the result of lobbying efforts of members of various religious groups" both in and outside of Mapleton. (Id., ¶ 7) Under § 18.B of the Ordinance, adult cabaret establishments featuring topless dancers or waitresses are prohibited from selling alcoholic beverages. (Id.). When Ordinance 98–02 was enacted, the Mapleton Board acknowledged that as of that date, there were two licenses for the sale of alcoholic liquor in Mapleton, one being Cathy's Tap. (Id., ¶ 15; Ord. 98–02 § 4). According to Cathy's Tap, "the purport and effect of Ordinance 98–02 was to single out and make unlawful the sale of alcohol by the Plaintiff in conjunction with the Plaintiff's providing expression of non-obscene erotic communications in the form of live non-obscene nude dancing...." (Third Amended Complaint, ¶ 14).

"[E]ither on its own or pursuant to the lobbying efforts of various religious groups" both in and outside Mapleton, Mapleton enacted a second ordinance, Ordinance 98–03, which went into effect on August 3, 1998. (Id., ¶ 9). Pursuant to the Ordinance, employees of adult entertainment establishments are prohibited from appearing or performing completely nude, performing "specified sexual activities," and performing "straddle dances." (Id., ¶¶ 9 and 12; Ord. 98–03 §§ 3(T), 3(U), and 11(F)(1)).[1] Ordinance 98–03 also provides for the creation of an Adult Use Commissioner and sets forth regulations relating to "adult establishment licenses." It further provides existing establishments, such as Cathy's Tap, with a grace period of 60 days to secure an appropriate license. (Third Amended Complaint, ¶ 11; Ord. 98–03 § 5(F)(1)).

Cathy's Tap applied for a renewal of its liquor license on or about May 29, 1998, and on or about June 30, 1998, secured a renewal. According to Cathy's Tap, it had

---

1. Section 3(T) of Ordinance 98–03 provides:

 *Specified Sexual Activities.* Any of the following:
 1. Fondling or other erotic touching of human genitals, pubic region, buttocks, anus, or female breasts.
 2. Sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation, or sodomy.
 3. Masterbation, actual or simulated.

 4. Human genitals in a state of sexual stimulation, arousal, or turnescence.
 5. Excretory functions as part of or in connection with any of the activities set forth in Paragraphs 1, 2, 3, or 4 of this definition.

 In its Third Amended Complaint, Cathy's Tap alleges that the "entertainment" provided at its establishment does not include any of the specified prohibited activities. (*See* Third Amended Complaint, ¶ 14).

advised Mapleton prior to the renewal date that it was providing non-obscene, live nude dancing performed by females. On August 5, 1998, the Liquor Commissioner entered an order pursuant to § 18 of Ordinance 98–02 revoking the license. (Third Amended Complaint, ¶ 18).[2]

On or about August 4, 1998, Cathy's Tap procured an application for an adult use license pursuant to Ordinance 98–03. After being denied its first application for an adult use license, Cathy's Tap submitted another application, which was denied in or about February, 1999. (*Id.*, ¶ 20).

In Count I of the Third Amended Complaint, Cathy's Tap alleges that the Ordinances serve as bills of attainder, which are prohibited by Article I, § 9, Clause 3 of the United States Constitution.[3] Specifically, Cathy's Tap alleges that Ordinance 98–02, which led to the revocation of the liquor license, and Ordinance 98–03, which prohibits Cathy's Tap from offering nude dancing, legislatively adjudicated it to be guilty of a prohibited activity. (*Id.*, Count I, ¶ 21).

In Count II, Cathy's Tap alleges that Ordinance 98–02 deprives it of its First Amendment right "to sell liquor by the drink in conjunction with the provision of non-obscene erotic message in the form of non-obscene, live nude dancing" (*See id.*, Count II, ¶ 21). Cathy's Tap also alleges in Count II that Ordinance 98–03, by prohibiting live, nude dancing, violates the First Amendment right to freedom of expression. (*Id.*, Count II, ¶ 22).

In Count III, Cathy's Tap alleges that both Ordinances constitute an unlawful prior restraint. (*Id.*, Count III, ¶ 21).

Lastly, in Count IV, Cathy's Tap alleges that the Ordinances violate the Establishment Clause under the First Amendment because they are "the substantial result of pressure and efforts of individuals and religious organizations" which oppose nude dancing and/or the sale of liquor by the drink. (*Id.*, Count IV, ¶ 19).

## II. Procedural Background

On November 13, 1998, Defendants filed a Motion to Dismiss Cathy's Tap's Second Amended Complaint. On January 6, 1999, Cathy's Tap filed its Response, and oral arguments were heard by the Court on Defendants' Motion on February 1, 1999. On February 22, 1999, the Court entered a Minute Order directing Defendants to re-

---

**2.** Section 18 of Ordinance 98–02 provides, in relevant part:

No licensee shall be allowed to sell alcoholic liquor in conjunction with an adult use on the premises. The following shall be considered adult uses for the purposes of this Ordinance:

 * * * * * *

B. Adult Entertainment Cabaret: A public or private establishment which is licensed to serve food and/or beverages, which features topless dancers and/or waitresses, strippers, male or female impersonators, or similar entertainers engaged in "specified sexual activities" or displaying "specified anatomical areas."

 * * * * * *

For the purpose of this Ordinance, "specified anatomical areas" shall include any of the following conditions:

A. Less than opaquely covered:
1. Human genitals, pubic region, or pubic hair;
2. Buttock; and
3. Female breast below a point immediately above the top of the areola.

B. Human male genitals in a discernibly turgid state, even if completely covered.

 * * * * * *

For the purposes of this Ordinance, "specified sexual activities" shall include any of the following conditions:

A. Human genitals in a state of sexual stimulation or arousal.

B. Acts or representations of acts of human masturbation, sexual intercourse or sodomy, bestiality, oral copulation, or flagellation.

C. Fondling or erotic touching of human genitals, pubic region, buttock, or female breast.

D. Excretory functions as a part of or in connection with any activities set forth in subsections A through C of this definition.

**3.** The bills of attainder prohibition set forth in Article I, § 9 is actually directed at only the federal government. The bills of attainder prohibition that applies to the States is found in Article I, § 10, Clause 1.

ply to Cathy's Tap's argument in its Response that the Ordinances in question constitute an unconstitutional prior restraint in violation of the Free Speech Clause of the First Amendment. Although Cathy's Tap had made a prior restraint argument in its Response to the Motion to Dismiss, this cause of action was not explicitly pleaded in the Second Amended Complaint.

Without causing Defendants to respond to the Court's Minute Order, Cathy's Tap sought leave of the Court to file a Third Amended Complaint. Defendants did not object. Cathy's Tap filed its Third Amended Complaint on April 14, 1999. Defendants subsequently moved to dismiss Cathy's Tap's prior restraint count and renewed their request to dismiss the other counts in Cathy's Tap's Second Amended Complaint, which are included as Counts I, II, and IV in the Third Amended Complaint.[4] On June 8, 1999, Cathy's Tap filed its Response to Defendants' Motion to Dismiss Count III of the Third Amended Complaint. This Order follows.

### III. Standards for Motions to Dismiss

In resolving a motion to dismiss, this Court must consider all well pleaded facts as true and must draw all inferences in favor of the non-moving party. *See Bontkowski v. First Nat'l Bank of Cicero,* 998 F.2d 459, 461 (7th Cir.1993), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993). In ruling on a motion to dismiss, courts consider whether relief is possible under any set of facts that could be established as consistent with the allegations in the Complaint. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). This Court will dismiss a claim only if it is beyond doubt that no set of facts would entitle the Plaintiff to relief. *See Chaney v. Suburban Bus Div.,* 52 F.3d 623, 627 (7th Cir.1995); *Venture Assoc. Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 432 (7th Cir.1993).

4. Counts I, II, and IV of the Third Amended Complaint correspond with Counts I, II, and

### IV. Bills of Attainder Claim—Count I

A law that legislatively determines guilt and inflicts punishment upon an identifiable group or individual without the protections of a judicial trial is a bill of attainder. *See United States v. Brown,* 381 U.S. 437, 445, 447, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965); *United States v. Lovett,* 328 U.S. 303, 315–16, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). Accordingly, to demonstrate that a legislative enactment is a bill of attainder, a party must demonstrate that the enactment (1) is specifically aimed at an affected person or group; (2) imposes a punishment on that person or group; and (3) imposes that punishment without a judicial trial. *See Dehainaut v. Pena,* 32 F.3d 1066 (7th Cir. 1994).

As a threshold matter, a bill of attainder must "specifically designate persons or groups" for punishment. *See Selective Serv. Sys. v. Minnesota Pub. Interest Research Group,* 468 U.S. 841, 847, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984). Cathy's Tap's position as to the specificity of Ordinances 98–02 and 98–03 is based on the following facts: (1) § 4 of Ordinance 98–02 provides that there are currently two liquor licenses in Mapleton; (2) § 4 further provides that at any time one of the licenses lapses for non-renewal or is revoked, the maximum number of licenses shall be reduced to one; (3) § 18 of Ordinance 98–02 provides that there shall be no sale of liquor in conjunction with an adult entertainment cabaret; and (4) Ordinance § 98–03 specifically bans live nude dancing. In short, Cathy's Tap argues that because it was one of only two businesses licensed to sell alcohol and because it was offering cabaret entertainment, the Ordinances were specifically aimed at it.

*Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), affirming a dismissal of a bill of attainder claim, is the most

III of the Second Amended Complaint.

instructive Supreme Court case on the issue of specificity. In that case, the Supreme Court determined that the Presidential Recordings and Materials Preservation Act, although referring to President Nixon by name, was not an attainder upon the president. To put it simply, the statute at issue preserved President Nixon's records. In fact, Title I of the Act dealt exclusively with President Nixon's papers. The Court explained that this specificity "is easily explained by the fact that at the time of the Act's passage, only his materials demanded immediate attention." *Id.* at 472, 97 S.Ct. 2777. In other words, President Nixon constituted a "legitimate class of one." *Id.*

■ In this case, the Mapleton Ordinances do not make any explicit reference to Cathy's Tap. Ordinance 98–02 does, however, at least indirectly refer to Cathy's Tap by providing that at the time of its enactment there were currently two licenses for the sale of liquor in effect. Additionally, at the time of the enactment of 98–03, Cathy's Tap was an adult entertainment cabaret as defined in the Ordinance. Therefore, it appears that Cathy's Tap was one of only two establishments to which both Ordinances could have applied at the time of their enactment. Despite these facts, however, Cathy's Tap still fails to meet the threshold requirement for demonstrating that the Ordinances are bills of attainder. In short, the Ordinances at issue are not even as specific as the act at issue in *Nixon*, which failed to meet the initial threshold requirement for being a bill of attainder.

The Ordinances are also distinguishable from the legislative enactments deemed by the Supreme Court as meeting the threshold requirement for being a bill of attainder. For example, in *United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), the Supreme Court held that a law prohibiting "Communists" from serving as a member of an executive board of a labor organization was impermissible under the bills of attainder clause because it failed to set forth a generally applicable rule that applied to all persons, Communist or not, who were likely to initiate political strikes, which was the alleged evil Congress sought to remedy. *See id.* at 450, 85 S.Ct. 1707. The Ordinances are also not like the law at issue in *Cummings v. Missouri*, 4 Wall. 277, 71 U.S. 277, 18 L.Ed. 356 (1866). There, the Supreme Court struck down a provision of the Missouri post-Civil War Reconstruction Constitution that barred persons from various professions unless they stated under oath that they had not given aid or comfort to persons engaged in armed hostility and had never "been a member of, or connected with, any order, society, or organization, inimical to the government of the United States." *Id.* at 279. The Court recognized that the oath was not a means to determine who was qualified for a certain profession but was designed "to reach the person, not the calling." *See id.* at 320.

Unlike the laws at issue in *Brown* or *Cummings*, the Ordinances here are of general applicability. For example, § 4 of Ordinance 98–02 states that the maximum number of liquor licenses available in Mapleton is one, if and when one of the two licensees loses its license. This provision not only affects Cathy's Tap and the other licensee, but it also affects other business interests in Mapleton that may, in the future, decide they want to obtain a license for the sale of alcohol. Additionally, § 18's prohibition against the sale of alcohol in conjunction with adult entertainment not only applies to Cathy's Tap, but also to other businesses that in the future decide to offer adult cabaret, sell adult books, or show adult motion pictures. Furthermore, the specific prohibited acts provision set forth in § 11(F) of Ordinance 98–03 not only applies to Cathy's Tap, but also to businesses who in the future decide that they want to offer not only adult cabaret, but adult motion pictures and books. Accordingly, the Court holds that Cathy's Tap's Third Amended Complaint fails to allege facts that, if true, would enable it to

meet the threshold requirement for proving that the Ordinances at issue are bills of attainder.

## V. Freedom Speech Claim: Nude Dancing and Selling Liquor in Conjunction with Nude Dancing—Count II

In Count II, Cathy's Tap seeks an order from this Court declaring that Ordinance 98–02 is facially unconstitutional under the Free Speech Clause, as it "prohibit[s] the sale of liquor associated with non-obscene nude dancing." (Third Amended Complaint, Count II, ¶ 25(a)). It further seeks an order enjoining Mapleton from taking further steps to effect the final revocation of the liquor license under Ordinance 98–02 and from denying Cathy's Tap's adult use license under Ordinance 98–03. (*Id.*, ¶ 25(b)). Lastly, it seeks compensatory damages for the revocation of the liquor license. (*Id.*, ¶ 25(c)).

Cathy's Tap concedes that there is not a constitutional right to consume alcohol. Nevertheless, it argues that "under the theory of unconstitutional conditions, the property right in a liquor license cannot be revoked by the exercise or pursuit of constitutionally protected conduct in the form of the communication of erotic messages through non-obscene live nude dancing." (Response at 27). Cathy's Tap further argues that "there must be some separate justification other than the suppression of protected conduct in order to justify revocation of a liquor license." (*Id.*).

### A. Ordinance 98–03

Because Cathy's Tap's various arguments hinge on the constitutionality of banning live nude dancing, the Court addresses this issue first. Section 11(F)(1) of Ordinance 98–03 provides, "No Adult Establishment Employee or any other person at any Adult Entertainment Establishment shall appear, be present, or perform while Nude." Ord. 98–03, § 11(F)(1). "Nude or State of Nudity" is defined in the Ordinance as:

A state of dress or undress that exposes to view (1) less than completely and opaquely covered human genitals; pubic region; anus; or female breast below a point immediately above the top of the areolae, but not including any portion of the cleavage of the female breast exhibited by a dress, blouse, shirt, leotard, bathing suit, or other wearing apparel, provided the areolae is not exposed ...

Ord. 98–03, § 3(O). By prohibiting exposure of genitals, the anus, and the female areolae, Ordinance 98–03 essentially requires that cabaret entertainers or erotic dancers wear a G-string, or a thong, and pasties.

In *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66, 581, 587–88, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), eight of the nine Justices recognized that totally nude, non-obscene dancing is expressive conduct that is entitled to at least minimal protection under the First Amendment. In *Barnes*, however, a splintered majority of the Supreme Court found that an Indiana statute banning public nudity was not unconstitutional as it applied to totally nude, erotic dancing. *See id.* at 572, 111 S.Ct. 2456 (plurality); *id.* at 580–81, 111 S.Ct. 2456 (Scalia, J., concurring); *id.* at 587, 111 S.Ct. 2456 (Souter, J., concurring). Mapleton argues that *Barnes* requires this Court to uphold its ban on totally nude dancing.

The plurality analyzed the Indiana statute under the four-part test set forth by the Court in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Under the *O'Brien* test, a regulation that burdens expressive conduct, as opposed to pure speech, is justified if: (1) it is within the constitutional power of the government, (2) it furthers an important governmental interest; (3) the governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment rights is no greater than necessary to further that interest. *See id.* at 377, 88 S.Ct. 1673. The *Barnes* plurality found that it was within the constitutional power of Indiana to provide for the health and welfare of its citizens. *See Barnes*, 501 U.S.

at 569, 111 S.Ct. 2456 (plurality). Second, the plurality determined that the Indiana law furthered the State's substantial interest in protecting order and morality. *See id.* Third, the plurality found that the statute was unrelated to expressive conduct since it was not the dancing that was prohibited, "but simply its being done in the nude." *See id.* at 570–71, 111 S.Ct. 2456. Lastly, the requirement that dancers wear G-strings and pasties was "the bare minimum necessary to achieve the State's purpose." *See id.* at 572, 111 S.Ct. 2456. Consequently, the plurality held that the Indiana statute passed the *O'Brien* test.

Justice Scalia concurred in the judgment, but he saw the Indiana law as a regulation that was not targeted at expressive conduct and, therefore, was not subject to First Amendment scrutiny. *See id.* at 576, 111 S.Ct. 2456 (Scalia, J., concurring). Therefore, according to him, the *O'Brien* test was not even applicable. Instead, he applied the rational basis test to the statute and found it to be constitutional. *See id.* at 580, 111 S.Ct. 2456.

Justice Souter, the fifth vote in upholding the statute, agreed with the plurality's conclusion that the *O'Brien* test was the applicable test; however, he parted with the plurality regarding their conclusion that public morality was sufficient cause to justify the limitation on totally nude dancing. *See id.* at 581, 111 S.Ct. 2456 (Souter, J., concurring). Instead, by drawing an analogy between the case in *Barnes* and cases in which the Supreme Court had approved zoning restrictions on establishments offering other forms of adult entertainment, he found that Indiana had a substantial interest in combating the secondary effects of "prostitution, increase[d] sexual assaults, and [the] attract[ion] of other criminal activity." *See id.* at 582, 111 S.Ct. 2456. Therefore, because of the substantial interest in preventing or eradicating these secondary effects, Indiana could legitimately restrict nude dancing.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as the position taken by those members who concurred in the judgment on the narrowest grounds." *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (internal quotation marks and citations omitted). Since the *Barnes* decision, the Seventh Circuit has determined that "Justice Souter's reasoning ... appears to be the narrowest reasoning supporting the judgment." *DiMa Corp. v. Town of Hallie,* 185 F.3d 823 (7th Cir.1999).

Important to this case is Justice Souter's articulation of the secondary effects that are commonly associated with adult entertainment. The secondary effects to which he referred were not derived from the face of the statute at issue or from oral or written legislative history. *See id.* at 582, 111 S.Ct. 2456 ("It is ... true that this justification [of combating secondary effects] has not been articulated by Indiana's Legislature or by its courts."). Mapleton, accordingly, argues that Ordinance 98–03 is constitutional under the four-part *O'Brien* test for the same reasons that the Indiana statute at issue in *Barnes* is constitutional: it furthers the important government interest of combating the harmful secondary effects associated with adult-oriented entertainment, *see id.* at 582–85, 111 S.Ct. 2456; the restriction on live nude dancing is unrelated to the expression of free expression since its interest in banning nude dancing results from a simple correlation of such dancing with harmful secondary effects, *see id.* at 585–86, 111 S.Ct. 2456; and the requirement of wearing pasties and a G-string restricts the protected speech no greater than essential to further Mapleton's interest in combating harmful secondary effects, *see id.* at 587, 111 S.Ct. 2456.

■. Mapleton has made a very compelling argument that based on *Barnes,* Ordinance 98–03 is not unconstitutional by prohibiting live nude dancing. However, this Court is not writing on a clean slate in this case. The Seventh Circuit's opinion in

*DiMa* makes it clear that the issue of whether it is constitutional for Mapleton to prohibit live nude dancing cannot be resolved at the motion to dismiss stage, despite the preamble of Ordinance 98–03 stating that the Board passed the Ordinance to combat the harmful secondary effects associated with adult-oriented business and relied upon various studies, reports, articles, and judicial decisions, and the experience and legislative findings of other municipalities and counties in northern and central Illinois. *See* Ord. 98–03, Recitals. According to the *DiMa* court, "conclusory assertions [in an ordinance's preamble] are insufficient by themselves to survive a First Amendment challenge because they are not 'evidence'...." *DiMa*, 185 F.3d at 829. The *DiMa* court further stated:

> Our First Amendment jurisprudence requires that the municipality identify the justifying secondary effects with some particularity, that [it] offer some record support for the existence of those effects and for the Ordinance's amelioration thereof, and that the plaintiffs be afforded some opportunity to offer evidence in support of the allegations of their complaint.

*Id.* (citation, internal quotation marks, and modifications omitted).

Based on this admonition, the Court is unable to conclude at this stage of the litigation that Ordinance 98–03, to the extent it bans live nude dancing, is constitutional. This Court does question the wisdom of the *DiMa* court's admonition in light of Justice Souter's statement in *Barnes* that governmental bodies should not "be required affirmatively to undertake to litigate this issue [of harmful secondary effects] repeatedly in every case." *Barnes*, 501 U.S. at 584–86, 111 S.Ct. 2456 (Souter, J.). The Court also questions what the *DiMa* court meant by stating that "the plaintiffs [must] be afforded some opportunity to offer evidence in support of the allegations of their complaint." *DiMa*, 185 F.3d at 829. The *DiMa* court subsequently stated that the district court in that case properly rejected the plain-

tiff's expert evidence allegedly showing that there is no relationship between an adult-oriented business' hours of operation and harmful secondary effects since such evidence was "irrelevant to the question of whether there is some evidence that does support the Board's conclusions." *Id.* at 831. Nonetheless, in the hierarchical scheme of things, it is not this Court's place to second guess the Seventh Circuit's reading of the *Barnes* decision.

Accordingly, although the municipality's burden in this type of case "is not overwhelming," *see id.* at 828, it is still a burden that must met. Because this matter is before the Court on a Rule 12(b)(6) Motion, the requisite record is not present and, hence, Mapleton has not met that burden. Consequently, this Court cannot conclude as a matter of law in the context of a Motion to Dismiss that Ordinance 98–03 is constitutional insofar as it bans live nude dancing.

■■■ With that said, however, the Court rejects, as a matter of law, certain arguments and/or claims made by Cathy's Tap in its Third Amended Complaint and Response. Cathy's Tap claims, at least implicitly, that because there is no evidence of harmful secondary effects in Mapleton, the prohibition of live nude dancing is unconstitutional. Even assuming for the sake of argument that Cathy's Tap can prove by a preponderance of the evidence that harmful secondary effects have not occurred as a result of it offering live nude dancing (and/or live nude dancing in conjunction with the sale or consumption of alcohol), it cannot prevail on this point. There is no requirement that Mapleton await the occurrence of such secondary effects before it enacts legislation designed to prevent them. As explained by the Fourth Circuit, "To insist that governmental interests justifying [adult] use legislation could only be found in specific local experiences and conditions would be unrealistically to require deliberate subjection to those experiences and conditions before attempting to avoid them." *Wall*

*Distributors, Inc. v. City of Newport News*, 782 F.2d 1165, 1169–70 n. 7 (4th Cir.1986). Furthermore, Cathy's Tap's allegations concerning the influence of religious persons and organizations allegedly exerted on the Village to pass these Ordinances is equally unavailing, as a court cannot "strike down an otherwise constitutional statute on the basis of an alleged illicit motive." *See Renton*, 475 U.S. at 48, 106 S.Ct. 925 (citing *O'Brien*, 391 U.S. at 383, 88 S.Ct. 1673); *see also DiMa*, 185 F.3d at 828 ("The actual motives of those who enacted the ordinance are irrelevant to our First Amendment analysis.")

### B. Ordinance 98–02

Cathy's Tap claims that Ordinance 98–02 is unconstitutional on its face under the Free Speech Clause "as prohibiting the sale of liquor associated with non-obscene nude dancing." (Third Amended Complaint, Count II, ¶ 25(a)). Although it admits that there is not a constitutional right to consume alcohol, Cathy's Tap argues that Ordinance 98–02 is unconstitutional since it places on a liquor licensee the alleged unconstitutional condition of foregoing a property right to offer constitutional expression in the form of non-obscene live nude dancing.

■ In its Motion to Dismiss, Mapleton does not attack the unconstitutional condition theory advanced by Cathy's Tap. Instead, like it did in arguing that a prohibition on live nude dancing is constitutional, Mapleton argues that a prohibition on the sale of alcohol in conjunction with nude dancing is constitutionally permissible under the four-part *O'Brien* test: it furthers the governmental interest of combating the combustible mixture of nudity and alcohol; the restriction on selling alcohol in conjunction with live nude dancing is unrelated to the suppression of free expression since its interest in prohibiting the sale of alcohol in conjunction with nude dancing results from the simple correlation that the mixture of nudity and alcohol begets undesirable behavior; and the restriction of the sale of alcohol in conjunction with live nude dancing is no greater than necessary to further its interest.

For the reasons the Court has set forth above for denying Mapleton's Motion to Dismiss as it pertains to Cathy's Tap's claim that a prohibition of live nude dancing is unconstitutional, the Court denies the Motion to Dismiss as it pertains to Cathy's Tap's claim that it is unconstitutional to ban live nude dancing in conjunction with the sale of alcohol. There must be record support of the existence of harmful secondary effects associated with the mixture of the sale and/or consumption of alcohol in conjunction with live nude dancing and for the Ordinance's amelioration thereof. *See DiMa*, 185 F.3d at 828.

## VI. Free Speech Claim: Prior Restraint—Count III

In Count III of the Third Amended Complaint, Cathy's Tap alleges that Ordinances 98–02 and 98–03 constitute unlawful prior restraints in that they: (1) confer "unfettered discretion" upon the Village Liquor Commissioner and Adult Use Commissioner, respectively (Third Amended Complaint, Count III, ¶ 13); and (2) fail to provide for immediate judicial review. (*Id.*, ¶ 21).

In *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), the Supreme Court struck down a Maryland motion picture censorship statute on the ground that the statute was an unconstitutional prior restraint. Pursuant to the censorship statute, a person seeking to exhibit a motion picture had to submit the picture to a board of examiners before the picture was exhibited. The board of examiners, in turn, approved only those films that were "moral and proper" and disapproved of those films that tended to "debase or corrupt morals or incite to crimes." *Id.* at 52 n. 2, 85 S.Ct. 734. The Court held "that a noncriminal process which requires the prior submission of a film to a censor avoids constitutional infirmity only if it takes place under the procedural safeguards designed to obviate the dangers of a censorship system." *Id.* at 58, 85 S.Ct.

734. The *Freedman* Court then set forth the necessary procedural safeguards: (1) any prior restraint in advance of a final judicial determination on the merits must be no longer than necessary to preserve the status quo pending judicial resolution; (2) a prompt judicial determination must be available; and (3) the would be censor bears the burden of going to court and the burden of proof in court. *See id.* at 58–59, 85 S.Ct. 734. Applying this standard to the statute at issue, the Supreme Court concluded that the statute was an unconstitutional prior restraint because: (a) the film exhibitor had to assume the burden of instituting judicial proceedings and of persuading the courts that the film was protected expression; (b) once the board of examiners acted against a film, exhibition thereof was prohibited pending judicial review; and (c) there was no assurance of prompt judicial review. *See id.* at 59–60, 85 S.Ct. 734.

The *Freedman* Court concluded its opinion by providing an example of a constitutionally acceptable prior restraint:

> How or whether Maryland is to incorporate the required procedural safeguards in the statutory scheme is, of course, for the State to decide. But a model is not lacking: In *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469, we upheld a New York injunctive procedure to prevent the sale of obscene books. That procedure postpones any restraint against sale until a judicial determination of obscenity following notice and an adversary hearing. The statute provides for a hearing one day after joinder of issue; the judge must hand down his decision within two days after termination of the hearing. The New York procedure operates without prior submission to a censor, but the chilling effect of a censorship order, even one which requires judicial action for its enforcement, suggests all the more reason for expeditious determina-

tion of the question whether a particular film is constitutionally protected.

*Id.* at 60, 85 S.Ct. 734.

Supreme Court cases subsequent to *Freedman,* however, clearly hold that all of the three *Freedman* protections are not necessarily required for a prior restraint to be constitutional. In *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), the Supreme Court struck down as an unconstitutional prior restraint a Dallas ordinance that regulated "sexually oriented businesses" through a scheme incorporating zoning, licensing, and inspections. Justice O'Connor, writing for the plurality, stated that Supreme Court cases addressing prior restraints have identified two "evils" that cannot be tolerated: (1) a prior restraint that places unbridled discretion in the hands of government officials; and (2) a prior restraint that fails to place limits on the time within which the decision maker must issue a license. *See id.* at 226, 110 S.Ct. 596 (plurality). The plurality held that the Dallas ordinance was an unconstitutional prior restraint because the ordinance "[did] not provide for an effective limitation on the time within which the licensor's decision must be made." *Id.* at 229, 110 S.Ct. 596 (plurality).

However, although the Dallas ordinance was held unconstitutional by the Supreme Court, *FW/PBS* makes it clear that the third *Freedman* protection is unnecessary when the ordinance or statute does not require an official to exercise discretion by passing judgment on the content of protected speech. The *FW/PBS* plurality explained:

> The core policy underlying *Freedman* is that the license for a First Amendment-protected business must be issued within a reasonable period of time, because the undue delay results in the unconstitutional suppression of protected speech. Thus, the first two safeguards are essential: the licensor must make the decision whether to issue the license within a specified and reasonable

time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the event that the license is erroneously denied.

*Id.* at 228, 110 S.Ct. 596. However, the plurality held that the third *Freedman* requirement—that the censor bear the burden of going to court if the speech is to be suppressed and of justifying the decision once in court—does not apply when the decision maker "does not exercise discretion *by passing judgment on the content* of any protected speech." *Id.* at 229, 110 S.Ct. 596 (emphasis added). Also, "[b]ecause the license [was] the key to the applicant's obtaining and maintaining a business, there [was] every incentive for the applicant to pursue a license through the court." *Id.* at 229–30, 110 S.Ct. 596.

In *Graff v. City of Chicago*, 9 F.3d 1309 (7th Cir.1993) (en banc), a splintered Seventh Circuit court analyzed a Chicago ordinance governing the licensing of sidewalk newsstands. Under the ordinance at issue in *Graff,* the Chicago commissioner of transportation considered six exclusive criteria by which to grant or deny permission to build a newsstand, which did not vest a large amount of discretion in the commissioner or require him to evaluate the content of the materials to be sold on the newsstands. Because the discretion vested in the commissioner of transportation was minimal and the criteria did not require him to evaluate the content of newsstands, a majority of the en banc *Graff* court held that the third *Freedman* safeguard—that the censor bear the burden of going to court if the speech is to be suppressed and of justifying the decision once in court—need not be present for the ordinance to be a lawful prior restraint. *See id.* at 1323–25 (plurality); *id.* at 1330 (Flaum, J., concurring).

Additionally, because of the minimal discretion vested in the commissioner of transportation, a majority of the *Graff* court concluded that the ordinance was not unconstitutional despite lacking a self-contained provision for prompt judicial review. *See id.* at 1325 (plurality); *id.* at 1330

(Flaum, J., concurring). As explained by the plurality, the appropriate method in Illinois for reviewing the commissioner of transportation's administrative decision is by the common law writ of certiorari. *See id.* at 1325 (plurality). The plurality further explained:

> Unless excused, claimants have six months to file [a petition for writ of certiorari], wherein review is extremely broad in scope, and extends to all questions of fact and law contained in the record before the court, including de novo review of any constitutional issues.... The [state circuit] court determines from the record alone whether there is any evidence fairly tending to support the order reviewed, and the court cannot set aside the order unless it is contrary to the manifest weight of the evidence.... Findings and conclusions on questions of fact are prima facie true and correct. It is not the court's function to resolve conflicting evidence.... If the circuit court, on the return of the writ, finds from the record that the inferior tribunal proceeded according to law, the writ is quashed; however, if the proceedings are not in compliance with the law, the judgment and proceedings shown by the return will be quashed.
>
> In some other First Amendment cases the Supreme Court seemed to require an ordinance to provide for judicial review, even when the writ of common law certiorari is available. However, the Court has not been presented with the argument that certiorari was in itself sufficient review, especially where the state makes the common law writ the current common practice, and in fact forbids any other kind of review. We conclude that such review is sufficient. Illinois has shown that a judicial forum is available to review administrative decisions.

*Id.*

■ *Freedman, FW/PBS,* and *Graff* stand for several propositions. If a statute or ordinance is directed at the content of

protected speech, all three *Freedman* safeguards are necessary. However, if a statute or ordinance does not require an official to pass judgment on the content of protected speech, it need only provide for a prompt administrative decision on whether to grant a license and prompt judicial review of the administrative decision. Furthermore, *Graff* clearly holds, albeit in a splintered fashion, that a statute which is not directed at content need not contain a self-contained provision providing for prompt judicial review, and the Illinois procedure in the form of a common law writ of certiorari is a sufficient mechanism for judicial review of an administrative decision.

With these principles in mind, the Court turns to Ordinances 98–02 and 98–03. Mapleton argues that the alleged prior restraints in this case should be evaluated under the Seventh Circuit's opinion in *Graff,* i.e., the Ordinances are lawful prior restraints because: (1) liquor and adult use licenses are either granted or denied promptly; and (2) Illinois law provides for certiorari review of an administrative decision to deny a liquor and/or adult use license. *See* 735 ILCS 5/3–101 *et seq.*

Under Ordinance 98–03, the Adult Use Commissioner is required to grant or deny the issuance of a license to an applicant within 30 days after submission of a properly completed application. *See id.,* § 7(G). If the Adult Use Commissioner determines that an applicant has not met the requirements for the issuance of a license, he is required to provide the applicant with written notification and an explanation of his decision. *See id.,* § 7(B). If a licensee violates a provision of the Ordinance, its license may be suspended for no more than 30 days or revoked. Prior to a suspension or revocation of a license, the Adult Use Commissioner is required to provide notice to the licensee. *See id.,* § 17(B). The written notice notifies the licensee: (1) that the Adult Use Commissioner has determined that the license may be subject to revocation or suspension; (2) of the specific grounds for the Adult Use Commissioner's determination; and (3) of

the date for a hearing. *See id.,* § 17(B)(1). Within five days of service of the notice, a hearing must be conducted by the Adult Use Commissioner, or, at his discretion, by the Adult Use Commission. *See id.,* § 17(B)(2). At the hearing, the licensee is entitled to present evidence and witnesses to refute the grounds cited by the Adult Use Commissioner in the notice. Within three days of the hearing, the Adult Use Commissioner is required to render a decision. *See id.* Ordinance 98–03 explicitly provides that actions taken by Mapleton's Adult Use Commissioner in either denying, revoking, or suspending an adult use license are final and subject to judicial review. *See id.,* §§ 7(G), 17(B)(2).

Ordinance 98–02 does not explicitly provide for a hearing when the determination is made to grant or deny, suspend, or revoke a license. The Ordinance merely provides that an application for the issuance or renewal of a license must be made at least 30 days prior to the next Village Board meeting. Applications are then considered by the Board at the next meeting. *See* Ord. 98–02, § 10. With regard to revocation or suspension of a liquor license, the Ordinance merely provides that a license may be revoked or suspended for a violation of, *inter alia,* the terms of the Ordinance. *See id.,* § 19(B). Of course, Mapleton was not writing on a clean slate when it enacted Ordinance 98–02. The Illinois Liquor Control Act explicitly provides that the revocation or suspension of a local liquor license cannot occur until "after a public hearing by the local liquor control commissioner with a 3 day written notice to the licensee affording the licensee an opportunity to appear and defend." 225 ILCS 5/7–5.

A decision by Mapleton's Liquor Commissioner to issue or deny, revoke, or suspend a liquor license may be appealed to the State of Illinois Liquor Commissioner as provided by the Liquor Control Act. *See* Ord. 98–02, § 19(C). The Liquor Control Act further provides that "any order of a local liquor control commissioner levy-

ing a fine or refusing to levy a fine on a licensee, granting or refusing to grant a license, revoking or suspending or refusing to revoke or suspend a license ... may, within 20 days after notice of such order or action, be appealed ... to the State Commission." 235 ILCS 5/7–9. The Liquor Control Act also provides that the State Commission's administrative decision is subject to judicial review pursuant to the common law writ of certiorari as outlined in Illinois' Administrative Review Law Act, 735 ILCS 5/3–101 *et seq.*

Assuming under the Mapleton Ordinances that officials do not pass judgment on the content of protected speech, it is possible that the Seventh Circuit's opinion in *Graff* would require Count III to be dismissed. However, the Court is not convinced that this is the situation in this case. Mapleton argues that because Justice Souter and the three Justice plurality in *Barnes* analyzed the statute at issue in that case under the four-part *O'Brien* test, thereby implying that the statute was something other than content-based, the Ordinances at issue in this case are also content-neutral. However, the *DiMa* court cautioned courts and litigants not to "fall into the shorthand of simply referring to regulations like the one here as 'content-neutral'...." *DiMa,* 185 F.3d at 827. As explained by the *DiMa* court, the Supreme Court in *Renton* held that the regulation of sexually explicit material "would be treated *like* content-neutral time, place, and manner regulations, *not that it was* content-neutral." *Id.* (emphasis added). The Court further notes that Justice Souter and the three Justice plurality did not even treat the statute at issue as a content-neutral statute, but as one placing restrictions on expressive conduct, thereby requiring intermediate scrutiny analysis. *See Barnes,* 501 U.S. at 566–67, 111 S.Ct. 2456 (plurality); *id.* at 582, 111 S.Ct. 2456 (Souter, J.).

Perhaps an argument can be made that ordinances directed at sexually-oriented businesses should also be viewed with less scrutiny for purposes of determining whether the ordinances constitute prior restraints. However, this Court's reading of the plurality opinion in *FW/PBS* appears to refute such a blanket rule. The *FW/PBS* plurality stated that all three of the *Freedman* requirements were not required in that case because that ordinance at issue did not present the "grave dangers of a censorship system." *FW/PBS,* 493 U.S. at 228, 110 S.Ct. 596 (plurality). The reason that the ordinance did not present such dangers is because city officials did "not exercise discretion by passing judgment on the content of protected speech." *Id.* at 229, 110 S.Ct. 596. Hence, the use of a lesser prior restraint threshold by the *FW/PBS* plurality was not due to the fact that the ordinance was directed at sexually-oriented businesses, but due to the fact that the city officials did not pass judgment on the content of protected speech.

■ Mapleton has failed to convince the Court that something less than all three *Freedman* requirements are necessary. Both Ordinances arguably require Mapleton officials to judge the content of the erotic dancing offered by adult cabaret establishments in determining whether or not to revoke a license. In the case of Ordinance 98–02, a liquor license can be revoked or suspended by the Liquor Commissioner if a dancer engages in "specified sexual activities": (a) human genitals in a state of sexual stimulation or arousal; (b) acts or representations of acts of human masturbation, sexual intercourse or sodomy, bestiality, oral copulation, or flagellation; (c) fondling or erotic touching of human genitals, pubic region, buttock, or female breasts; and (d) excretory functions as part of or in connection with any of the aforementioned activities. *See* Ord. 98–02, §§ 18, 19(B). Similarly, an adult use license can be revoked by the Adult Use Commissioner if a dancer engages in "specified sexual activities": (a) fondling or other erotic touching of human genitals, pubic region, buttocks, anus, or female breasts; (b) sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation, or

sodomy; (c) masturbation, actual or simulated; (d) human genitals in a state of sexual stimulation, arousal, or tumescence; and (e) excretory functions as part of or in connection with the aforementioned activities. *See* Ord. 98–02, §§ 3(T), 11(F)(2), 17(A)(1). Additionally, for an adult use license to issue to an adult cabaret establishment, the applicant must, *inter alia,* confirm in writing under oath that its operation shall comply with the terms of Ordinance 98–03, *i.e.,* shall not offer adult cabaret that features "specified sexual activities." Ord. 98–03, § 8(A)(8).

Assuming for the sake of argument that the prohibited "specified sexual activities" are not protected speech under the First Amendment, the line between protected erotic dancing and at least some of the "specified sexual activities" is not easily discernable by censor. *Cf. Blount v. Rizzi,* 400 U.S. 410, 416, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971) (constitutionally protected speech is separated from unprotected obscenity "only by a dim and uncertain line"); *Entertainment Concepts, Inc., III v. Maciejewski,* 631 F.2d 497, 505 (7th Cir.1980).[5] For example, both Ordinances prohibit simulated sexual intercourse. Arguably, reasonable people could disagree whether an erotic dancer moving her hips in a certain fashion or doing a "pole dance," whether by herself or with another dancer, is simulating sexual intercourse or merely dancing in an erotic and constitutionally protected manner. Both Ordinances also prohibit erotic touching of female breasts. Arguably, reasonable people could disagree whether a female dancer lightly running her fingers across her cleavage while performing a dance constitutes such activity or is a constitutionally protected, erotic expression. If a censor inspecting an adult cabaret establishment were to conclude that a dancer moving her hips or doing a pole dance in a certain fashion were performing a specified sexual activity, then the establishment's adult use and/or liquor li-

cense is subject to revocation by the appropriate Village authorities. In other words, a censor could arguably chill protected speech for a period of time prior to any judicial determination. *See Freedman,* 380 U.S. at 57–58, 85 S.Ct. 734 ("Because the censor's business is to censor, there inheres the danger that he may well be less responsive than a court—part of an independent branch of government—to the constitutionally protected interests in freedom of expression.").

Furthermore, assuming that Ordinance 98–03's prohibition on totally nude dancing is constitutional, there remains the issue of a censor making a determination of whether a dancer's genitals, pubic region, anus, and areolas are "less than opaquely covered." Ord. 98–03, § 11(R). While arguably this is an objective inquiry on the part of a censor, there is also an argument that this inquiry presents the opportunity for a censor to manipulate the standard in § 11(R) to suppress protected speech of which he disapproves.

The Court recognizes the fact that courts are not to create remote or unlikely scenarios for the censorship of speech. *See Graff,* 9 F.3d at 1317 (plurality). However, unlike the Ordinance at issue in *Graff,* which was directed at all public newsstands, the Ordinances in this case are directed at a particular type of entertainment establishment, thereby, arguably, presenting a more immediate threat of censorship by manipulation of the standards set forth in the Ordinances.

In light of the fact that Mapleton has failed to convince the Court that the Ordinances do not confer discretion on city officials to pass judgment on the content of protected speech, it has also failed to convince the Court that the requisite procedural safeguards are present in the Ordinances for them to pass constitutional muster. It is questionable whether Illinois' certiorari process constitutes suffi-

---

5. The Court expresses no opinion on whether the "specified sexual activities" in both Ordinances are protected speech. This issue has neither been raised nor briefed by either party.

ciently prompt judicial review for if an ordinance confers such discretion. The Illinois Administrative Review Act provides that review of a final agency decision shall occur "with all convenient speed." 735 ILCS 5/3–110. In contrast, the New York statute identified by the *Freedman* Court as an example of a constitutional prior restraint provided that judicial review must occur within one day after joinder of issue and a judicial determination must be made within two days after the hearing. *See Freedman*, 380 U.S. at 60, 85 S.Ct. 734; *see also Graff*, 9 F.3d at 1330 (Flaum, J., concurring) (because the Chicago Ordinance did not involve "separating protected from unprotected speech," the certiorari process was a sufficient avenue for judicial review). Additionally, neither Ordinance requires Mapleton to bear the burden of proceeding to court prior to revoking a license and proving that the speech at issue—specified sexual activities—occurred and is unprotected. *See Freedman*, 380 U.S. at 58–59, 85 S.Ct. 734; *see also FW/PBS*, 493 U.S. at 231, 110 S.Ct. 596 (plurality) (because the Dallas ordinance did not purport to pass judgment on the content of any protected speech, the *Freedman* requirement that the censor bear the burden of going to court and the burden of proof in court was unnecessary).

▮ Mapleton also argues that Cathy's Tap's prior restraint argument is completely inapplicable to Ordinance 98–02 "because the issuance of a liquor license in no way implicates any First Amendment rights." (Motion to Dismiss Count III at 3 n. 2). The Court disagrees. A prior restraint occurs where communication is suppressed, either directly or by inducing excessive caution in the communicator, without a prior judicial determination that the speech is unprotected by the First Amendment. *See Alexander v. United States*, 509 U.S. 544, 551–52, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). Because reasonable people could disagree whether cer-

tain types of dancing, *e.g.*, pole dancing or moving one's hips in a certain manner, constitute simulated sex acts which are prohibited by Ordinance 98–02, Cathy's Tap or another liquor licensee might, arguably, curtail the permissible scope of its entertainment to ensure that its liquor license is not revoked under Ordinance 98–02 by a censor.

Accordingly, the Court denies Mapleton's request to dismiss Count III of the Third Amended Complaint. The Court wishes to make clear, however, that its denial of Mapleton's Motion to Dismiss Count III of the Third Amended Complaint should not be read as conclusively establishing, as a matter of law, that the Ordinances at issue must be analyzed under the stricter *Freedman* requirements, as opposed to the less stringent requirements of *Graff* and *FW/PBS*. Furthermore, the Court expresses no opinion whether the Ordinances at issue are lawful prior restraints even if analyzed under the less stringent requirements set forth in *Graff* and *FW/PBS*.

### VII. Establishment Clause Claim—Count IV

▮ The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. Amend. I. Since 1971, the test used to analyze challenges under the Establishment Clause has come from the Supreme Court's decision in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Therein, the Court articulated a three-part test that courts are to apply in determining whether a legislative enactment survives constitutional scrutiny: (1) whether the enactment has a secular purpose; (2) whether it advances or inhibits religion in its principal or primary effect; and (3) whether it fosters an excessive entanglement with religion. *See id.* at 612–13, 91 S.Ct. 2105. Although the *Lemon* test has been criticized by members of the Supreme Court and various lower courts, it "remains the operative

standard." *See Cohen v. City of Des Plaines,* 8 F.3d 484, 489 (7th Cir.1993) (citing cases).

■ The primary issue in this case re-regarding the Establishment Clause claim is whether the Ordinances have a secular purpose. Cathy's Tap explicitly alleges in its Third Amended Complaint that the Ordinances are a result of "the Village succumbing to the importuning of religious groups whose religious creed opposes either or both the provision of alcoholic beverages or the communication of non-obscene erotic messages through live non-obscene nude dancing." (Third Amended Complaint, ¶ 17).

■ The Court has not found any case in which the successful lobbying efforts of religious organizations or individuals invalidates a legislative enactment under the Establishment Clause. As explained by the Supreme Court:

Adherents of particular faiths and individual churches frequently take strong positions on public issues including . . . vigorous advocacy of legal or constitutional positions. Of course, churches as much as secular bodies and private citizens have that right. No perfect or absolute separation is really possible. . . .

*Walz v. Tax Comm'n of City of N.Y.,* 397 U.S. 664, 670, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). It would be a severe infringement on the free speech rights of those persons or groups with religious views to forbid them from lobbying their local government or, if allowed to lobby, to require them to leave their religious beliefs and convictions at the steps of city hall.

Furthermore, it is a well-settled maxim that courts are "reluctan[t] to attribute unconstitutional motives to the States, particularly *when a plausible secular purpose* for the State's program may be discerned from the face of the statute." *Mueller v. Allen,* 463 U.S. 388, 394–95, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983). In this case, a "plausible secular purpose" may be discerned from the face of each Ordinance. With regard to Ordinance 98–03, a plausi-ble secular purpose of combating the harmful secondary effects associated with adult-use establishments can be discerned from the face of the Ordinance. With regard to Ordinance 98–03, a plausible secular purpose of combating the combustible mixture of alcohol and nudity can be discerned from the face of the Ordinance.

The Court further concludes that the Ordinances neither advance nor inhibit religion in their principle or primary effect. The respective texts of the ordinances at issue here do not even begin to touch upon the subject of religion. Neither ordinance says anything positive or negative about religion. Religion is not cited as a justification for the Ordinances, nor do the Ordinances say anything about the religious beliefs of any business, employee, or patron. They do not require any person to believe or not believe in a religion, nor do they exalt any belief that can be fairly characterized as religious in nature. While, presumably, the beliefs of some religious groups and individuals are furthered by the enactment of these Ordinances, these benefits are neither directed toward nor limited to religious individuals. In summary, the Ordinances cannot be said to advance the religious tenets of those who live in and around the Village of Mapleton any more than the Civil Rights Act of 1964 can be said to have advanced the religious tenets of the many African–American clergymen who successively lobbied Congress for the codification of equal rights.

Lastly, no plausible argument can be made that the Ordinances foster an excessive entanglement with religion. Accordingly, the Court will not address this aspect of the *Lemon* test.

## VIII. Individual Capacity Claims Against Ken Odewalt—Qualified, Legislative, and Judicial Immunity

Defendant Ken Odewalt ("Odewalt"), who is Mapleton's Mayor or Village Board President, the Adult Use Commissioner, and the Liquor Commissioner, is named as a party Defendant in his individual capaci-

ty. Odewalt seeks dismissal from the case in his individual capacity under various theories of immunity.

## A. Qualified Immunity

When Odewalt originally sought qualified immunity, the Prior Restraint Count, Count III, had yet to be pleaded by Cathy's Tap. When Defendants moved to dismiss Count III after Cathy's Tap filed its Third Amended Complaint, Odewalt did not raise a qualified immunity defense to that Count. Because qualified immunity analysis is both fact and case law specific, the Court will not address in this Order whether Odewalt is entitled to qualified immunity on Count III. Furthermore, because Counts I and IV are dismissed with prejudice, the Court will address the qualified immunity argument only with respect to Count II.

Government officials enjoy qualified immunity from liability under 42 U.S.C. § 1983 unless their conduct violated "clearly established constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.*

 In light of the Supreme Court's opinion in *Barnes, supra,* the Court holds that the law regarding the constitutionality of prohibiting live nude dancing was not clearly established when Mapleton enacted Ordinance 98–03 and subsequently denied Cathy's Tap an adult use license. In fact, a reasonable government official could conclude based on a reading of the Supreme Court's opinion in *Barnes* that it was perfectly constitutional to enact and enforce an ordinance prohibiting live nude dancing. The Court also notes that Cathy's Tap, which bears to burden of showing that the law was clearly established, has not even addressed Odewalt's qualified immunity

argument. Accordingly, Odewalt is entitled to qualified immunity against Cathy's Tap's claim that the enactment and subsequent enforcement of Ordinance 98–03 unconstitutionally prohibit live nude dancing.

 The Court further concludes that the law regarding the constitutionality of prohibiting live nude dancing in conjunction with the sale and/or consumption of alcohol was not clearly established when Mapleton enacted Ordinance 98–03 and subsequently revoked Cathy's Tap's liquor license for violating the terms of the Ordinance. In *California v. LaRue,* 409 U.S. 109, 114, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), the Supreme Court approved, as a valid exercise of general police power, an ordinance prohibiting certain sexually oriented performances where liquor was sold. Additionally, the "added presumption in favor of State regulation" conferred by the Twenty–First Amendment further supported the Court's conclusion. *See id.* at 118, 93 S.Ct. 390. Since *LaRue,* other laws preventing adult-oriented establishments from providing liquor have been upheld by courts. *See, e.g., New York State Liquor Auth. v. Bellanca,* 452 U.S. 714, 718, 101 S.Ct. 2599, 69 L.Ed.2d 357 (1981) ("common sense indicates that any form of nudity coupled with alcohol begets undesirable behavior"); *City of Newport v. Iacobucci,* 479 U.S. 1047, 107 S.Ct. 913, 93 L.Ed.2d 862 (1987); *Sammy's of Mobile, Ltd. v. City of Mobile,* 140 F.3d 993 (11th Cir.1998); *Lanier v. City of Newton,* 842 F.2d 253 (11th Cir.1988).

Since the Supreme Court's decision in *LaRue,* the Court has backed away from justifying such laws on the basis of the Twenty–First Amendment. *See 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 515–16, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). However, "[e]ntirely apart from the Twenty–First Amendment, the State has ample power to prohibit the sale of alcoholic beverages in inappropriate locations." *Id.* at 516, 116 S.Ct. 1495. Accordingly, without disavowing the holding of *LaRue,* the *44 Liquormart* Court merely "disavow[ed] its reasoning insofar as it

relied on the Twenty–First Amendment." *Id.*

Although not explicitly addressing the issue of qualified immunity, Cathy's Tap cites the Seventh Circuit case of *Reed v. Village Shorewood,* 704 F.2d 943 (1983), as standing for the proposition that there must be some justification set forth in the ordinance for prohibiting the sale and/or consumption of alcohol in conjunction with nude dancing for the prohibition to be constitutional. In *Reed,* the Village of Shorewood attempted to prohibit a bar from selling alcohol while offering live rock and roll music. The Seventh Circuit, relying on the Supreme Court's holding in *Bellanca, supra,* stated that there must be some effort at justifying the prohibition. The *Reed* court noted that the *Bellanca* Court at least quoted a statement from the relevant legislative history of the challenged statute, which provided that " 'common sense indicates that any form of nudity coupled with alcohol in a public place begets undesirable behavior.' " *Reed,* 704 F.2d at 951 (quoting *Bellanca,* 452 U.S. at 718, 101 S.Ct. 2599).

Since the decisions in *Bellanca* and *Reed,* the Supreme Court decided *Barnes, supra.* As previously explained, both the *Barnes* plurality and Justice Souter attributed important governmental interests to the statute at issue without the benefit of any form of legislative history or findings. *See Barnes,* 501 U.S. at 561, 111 S.Ct. 2456 (plurality) ("It is impossible to discern, other than from the text of the statute, exactly what governmental interest the Indiana legislature had in mind. . . ."); *id.* at 582, 111 S.Ct. 2456 (Souter, J., concurring) (recognizing the lack of legislative history).

· In conclusion, the law at the time of the enactment of Ordinance 98–02 and the subsequent revocation of Cathy's Tap's liquor license regarding the prohibition of nude dancing in conjunction with the sale and/or consumption of alcohol was anything but well-settled. This is evinced by the number of courts that have upheld similar ordinances and statutes and the Supreme Court's opinion in *Barnes,* which can reasonably be read as not placing any duty upon a legislative body to set forth legislative findings and justifications when seeking to combat harmful secondary effects associated with nude dancing. Consequently, Odewalt is entitled to qualified immunity against Cathy's Tap's claim that the enactment and subsequent enforcement of Ordinance 98–02 unconstitutionally prohibit live nude dancing in conjunction with the sale and/or consumption of alcohol.

### B. Legislative and Judicial Immunity

Odewalt also argues that he is entitled to legislative and judicial immunity in his Motion to Dismiss. As with his claim of qualified immunity, when he asserted his claims to legislative and judicial immunity, Cathy's Tap had yet to file its Third Amended Complaint and, therefore, had yet to plead its prior restraint count. However, even though Odewalt's legislative and judicial immunity claims are not explicitly directed at the prior restraint count (the only count that remains for which he is potentially liable), the Court will address these immunity claims since such claims are not limited like a claim of qualified immunity to the particular facts of the case. In other words, Cathy's Tap was placed on notice that Odewalt is seeking legislative and judicial immunity, and his arguments in support of these claims are equally applicable to the prior restraint claims in Count III.

Odewalt asserts that as the Mayor, he is entitled to absolute legislative immunity for his legislative acts, and as the Liquor Commissioner who revoked Cathy's Tap's liquor license, he is entitled to judicial immunity. Based on the face of the Third Amended Complaint, the only allegedly unconstitutional acts on the part of Odewalt were signing the Ordinances as Mayor, revoking Cathy's Tap's liquor license, and denying it an adult use license.[6] In its

---

6. Cathy's Tap does not explicitly allege that Odewalt was the signatory of the Ordinances.

However, a review of the Ordinances, which

Response to the Motion to Dismiss, Cathy's Tap does not address Odewalt's claims that he is entitled to legislative and judicial immunity.

In *Bogan v. Scott-Harris*, 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998), the plaintiff filed suit against the mayor of Fall River, Massachusetts, and other city officials, alleging that the elimination of the city department in which the plaintiff was the sole employee was motivated by racial animus and a desire to retaliate against her for exercising her First Amendment rights in filing a complaint against another city employee. The mayor moved to dismiss the complaint, arguing that he was entitled to legislative immunity in that his act of signing into law the ordinance that stripped the plaintiff of her job was legislative. The Supreme Court agreed. In a unanimous opinion, the Court held that the absolute immunity from liability under 42 U.S.C. § 1983 long afforded to federal, state, and regional legislators equally applies to local legislators for their legislative acts. *See id.* at 972–73. The *Bogan* Court further held that the act of an executive, such a mayor, in signing an ordinance into law is a legislative act. *See id.* 118 S.Ct. at 973. It is also clear from Supreme Court precedent that the absolute immunity afforded to legislators includes immunity for damages, declaratory, and injunctive relief. *See Supreme Court of Va. v. Consumers Union of United States, Inc.*, 446 U.S. 719, 731–34, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); *see also Spallone v. United States*, 493 U.S. 265, 278, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) (dicta). Accordingly, to the extent that Odewalt is named in his individual capacity for his legislative acts as Mayor of Mapleton, he is dismissed with prejudice from this case.

Similarly, Odewalt is entitled to judicial immunity for his act as Liquor Commissioner in revoking Cathy's Tap's liquor license. In *Reed v. Village of Shorewood*, 704 F.2d 943, the Seventh Cir-cuit held that a local liquor commissioner's act of renewing or revoking a liquor license is judicial in nature. *Reed*, 704 F.2d at 951 (local commissioner is a "first-line adjudicator"). Accordingly, because the act of a local liquor control commissioner in either renewing or revoking a liquor license is judicial in nature, the *Reed* court held that a liquor control commissioner, like a state court judge, is immune from suits for damages under § 1983. However, unlike absolute legislative immunity, judicial immunity does not extend to lawsuits seeking prospective relief in the form of a declaratory judgment or an injunction. *See Pulliam v. Allen*, 466 U.S. 522, 542–43, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984). Accordingly, to the extent that Cathy's Tap is suing Odewalt in his individual capacity for the action he took as Liquor Commissioner in revoking Cathy's Tap's license, he may not be sued for damages. However, he may be sued in his individual capacity as Liquor Commissioner for injunctive and declaratory relief.

Mapleton does not argue that Odewalt is entitled to judicial immunity for his act as Adult Use Commissioner in denying Cathy's Tap an adult use license. Accordingly, the Court expresses no opinion whether the Seventh Circuit's holding in *Reed* would equally apply to a local administrative official passing on whether an adult use license should issue.

### IX. Conclusion

For the foregoing reasons, Mapleton's Motion to Dismiss Counts I, II, and IV [# 16–1] is GRANTED IN PART and DENIED IN PART, and its Motion to Dismiss Count III [# 28–1] is DENIED.

IT IS HEREBY ORDERED that Counts I and IV of the Third Amended Complaint are DISMISSED WITH PREJUDICE;

IT IS FURTHER ORDERED that Odewalt is entitled to qualified immunity

are attached to the Third Amended Complaint, reveals that Odewalt was the signatory of both Ordinances. (Third Amended Complaint, Ex. A and B).

against Cathy's Tap's claims in Count II of the Third Amended Complaint;

IT IS FURTHER ORDERED that Odewalt is immune from suit in his individual capacity for damages, declaratory, and injunctive relief for his legislative acts as Mayor of Mapleton; and

IT IS FURTHER ORDERED that Odewalt is immune from suit in his individual capacity for damages for his act as Liquor Commissioner in revoking Cathy's Tap's liquor license.

The Court will contact the parties shortly to schedule a supplemental Rule 16 conference. Defendants shall file their answer to the Third Amended Complaint within 14 days of the entry date of this Order.

### APPENDIX I TO ORDER

*VILLAGE OF MAPLETON
ORDINANCE NO. 98–
02*

AN ORDINANCE PROVIDING FOR THE REGULATION OF THE SALE OF ALCOHOLIC LIQUOR WITHIN THE VILLAGE OF MAPLETON.

BE IT ORDAINED BY THE VILLAGE BOARD OF THE VILLAGE OF MAPLETON, PEORIA COUNTY, ILLINOIS, AS FOLLOWS:

**1. *Sale of Alcoholic Liquor Regulated.***

The sale of alcoholic liquor within the village limits of the Village of Mapleton, Peoria County, Illinois, (the Village) is governed by the following definitions, provisions and restrictions.

**2. *Definitions.***

Unless the context requires otherwise, words and phrases used in this ordinance are to be given the definitions supplied by the Illinois Liquor Control Act of 1934, 235 ILCS 511–1, *et seq.*

**3. *License Required.***

No person shall sell, barter, solicit or receive orders for, keep or expose for sale, or keep with intent to sell any alcoholic liquor for beverage purposes without being first licensed to do so by the Village, and the State of Illinois and the United States when required. Sale without such license(s) shall, upon conviction, subject the seller to a fine of not less than Fifty ($50.00) nor more than Five Hundred ($500.00) Dollars for each offense. Each sale shall be considered a separate offense.

**4. *Number of Licenses Available, Priority for Granting.***

There are currently two (2) licenses for the sale of alcoholic liquor in effect at this time within the Village. At such time as one of these licenses is revoked or lapses for non-renewal, the maximum number of licenses in effect at any time within the Village shall be reduced to one (1). A license shall be issued to a qualified applicant therefor in the order of their respective applications. Priority shall be given, however, to the holder of any license currently in effect, or to a corporation owned solely by an individual holding an existing license if the licensee is transferring the licensed establishment to the corporation and the corporation is qualified under this Ordinance to hold the license, or to an individual solely owning a corporation holding an existing license if the licensee is transferring the licensed establishment to the individual and the individual is qualified under this Ordinance to hold the license, provided that the holder of a current license provides for the renewal thereof on or before thirty (30) days prior to the expiration of said current license. If renewal application is made after said thirty (30) day period, the current licensee shall lose his priority for renewal thereof, and a license will thereafter be issued to the first qualified applicant.

No license shall be issued to any person who is not qualified to receive a license under the requirements contained herein, and the Board of Trustees of the Village shall be the sole judge of the qualifications of any applicant.

### 5. *License is a Personal Privilege not Transferable.*

A license granted pursuant to this Ordinance shall be a purely personal privilege rather than a property interest, and shall be valid for no more than one (1) year. It shall not be subject to attachment, garnishment, or any other form of transfer or encumbrance. It shall cease upon the death of the licensee, provided that executors or administrators of the estate of the deceased licensee, and the trustee of an insolvent or bankrupt licensee, may continue the business of the sale of alcoholic liquor under order of the appropriate court for a period of no longer than six (6) months.

### 6. *Term of License.*

Licenses granted pursuant to this Ordinance shall run from the date of approval by the Board of Trustees, and shall expire, regardless of when granted, on the following June 30th unless revoked or suspended earlier as provided in this Ordinance. An applicant for a new license for less than a full annual period shall pay a one-twelfth ( 1/12) share of the license fee for each month or a part thereof that said license is to be effective. A license shall not be issued for less than a one (1) month period.

### 7. *Fees.*

The fee for a license granted pursuant to this Ordinance shall be SEVEN HUNDRED and FIFTY DOLLARS ($750.00) for one full year.

### 8. *Hours of Operation and Vacation of Premises.*

A. No one operating a liquor license granted pursuant to this Ordinance shall sell or otherwise deliver to any person any alcoholic liquor after 1:00 A.M., nor shall anyone other than the licensee, or licensee's employees while in the performance of their duties, remain within the premises after 1:30 A.M., and shall not reenter the premises until the licensee may open for business on the following business day as defined in (B) below.

B. The licensed premises shall not open for business before 6:00 A.M., Monday through Saturday inclusive, and not before 10:00 A.M. on Sunday.

### 9. *Persons Ineligible to be Licensed.*

No license for the sale of alcoholic liquor shall be granted to any of the following:

A. Any person otherwise ineligible under § 6-2 of the Illinois Control Liquor Act of 1934, 235 ILCS 5/6-2.

B. A person who is not a resident of the Village.

C. A person who is not of good character and reputation in the Village and in any community in which he or she has resided in the twelve (12) months preceding the filing of the petition for liquor license with the Village.

D. A person who is not a citizen of the United States.

E. A person who has been convicted of a felony under any Federal or State law, unless the Board of Trustees find that said person has been sufficiently rehabilitated to warrant the public trust after considering all relevant matters.

F. A person who has been convicted of a misdemeanor opposed to decency and morality.

G. A person who has previously had a federal license related to the manufacture, importation, distribution or sale of alcoholic liquor, a state Liquor Sale License or an Alcoholic Liquor Retail Sales License issued by the Village revoked for cause.

H. A person who at the time of application for renewal of a license issued hereunder would not be eligible for such license upon a first application.

I. A partnership unless all of the partners shall each be qualified to obtain a license.

J. A corporation unless it is incorporated in the State of Illinois or qualified to

transact business in the State of Illinois under the Business Corporation Act, and unless all officers, directors, and shareholders owning over five (5%) percent of the corporate stock is each qualified to obtain a license.

K. A person obtaining the license for a place of business to be run by a manager or agent, unless the manager or agent is qualified to obtain a license.

L. A person not the beneficial owner of the premises for which the license is sought, or does not have a lease thereon for the full period for which the license is to be issued.

M. Any law enforcing public official, including members of local liquor control commissions, any mayor, alderman, or member of the city council or commission, any president of the village board of trustees, any member of a county board; and no such official shall be interested directly in the manufacture, sale or distribution of alcoholic liquor, except that a license may be granted to such official in relation to premises which are not located within the territory subject to the jurisdiction of that official, if the issuance of such license is approved by the State Liquor Control Commission.

N. A person or enterprise holding a federal gaming device stamp.

O. A person who has been convicted of a gambling offense as prescribed by any of subsections (a)(3) through (a)(10) of Section 28–1 of, or as proscribed by Section 28–3 of, the "Criminal Code of 1961," approved July 28, 1961, as heretofore or hereafter amended, or as proscribed by a statute replaced by any of the aforesaid statutory provisions.

P. A partnership to which a federal wagering stamp has been issued by the federal government for the current tax period, or if any of the partners have been issued a federal gaming device stamp or federal wagering stamp by the federal government for the current tax period.

Q. A corporation, if any officer, manager or director thereof, or any stockholder owning in the aggregate more than 20% of the stock of such corporation has been issued a federal wagering stamp for the current tax period.

R. Any premises for which a federal wagering stamp has been issued by the federal government for the current tax period.

## 10. *Application.*

All applicants for a liquor license to be issued by the Village pursuant to the terms of this Ordinance, or for the renewal of an existing license issued by the Village pursuant to this Ordinance, shall submit an application to the Village Clerk at least thirty (30) days prior to the Village Board meeting at which the application shall be considered. The application shall be in the form supplied by the Village, and shall be completed in full by the applicant and signed under penalty of perjury. In the event such an application is not properly executed and submitted as provided herein, the application shall not be considered by the Village.

## 11. *Persons under Twenty-one (21) Years of Age.*

Each licensee shall display in a prominent place in any location used for the sale or serving of alcoholic liquor a sign reading substantially as follows:

"WARNING TO PERSONS UNDER THE AGE OF TWENTY–ONE (21)—You are subject to a fine of up to Five Hundred ($500.00) Dollars and criminal prosecution, under the laws of the State of Illinois and the Ordinances of the County of Peoria, if you purchase alcoholic liquors for yourself, or misrepresent your age, for the purpose of purchasing or obtaining alcoholic liquor for yourself."

**12. *Display of License.***

Each licensee shall display his license in a prominent place in any location used for the sale or serving of alcoholic liquor.

**13. *Reporting of Incidents.***

Each licensee and each of his agents and employees shall promptly report to the Peoria County Sheriff's Department any outbreak of any fights, riots, disturbances of the peace, or any act constituting an offense of any Village ordinances or a crime under the laws of the State of Illinois or the United States, occurring on or about the licensed premises. Each licensee shall further report any of the above incidents within twenty-four (24) hours of their commission to the Village Liquor Commissioner. The licensee and all agents or employees of the licensee shall truthfully and fully answer all questions and investigations of any identified agent of the Federal or Illinois Bureau of Investigation, Illinois Liquor Control Commission, Peoria County Sheriff or the Village Liquor Commissioner who makes inquiry in or about the licensed premises, and shall otherwise cooperate fully in any such investigations.

**14. *Employment of Persons under Twenty-one (21) Years of Age.***

No licensee shall employ or permit any person under the age of twenty-one (21) to sell or serve alcoholic liquor.

**15. *Sales to Persons of Non–Age, Intoxicated Persons, Etc.***

No licensee or officer, associate, member, representative, agent or employee of such licensee shall sell, give or deliver alcoholic liquor to any person under the age of twenty-one (21) years, or to any intoxicated person, or to any person known to him or her to be a habitual drunkard, a spendthrift, insane, mentally ill, mentally deficient, or in need of mental treatment. No person after purchasing or otherwise obtaining alcoholic liquor shall sell, give or deliver said alcoholic liquor to another person under the age of twenty-one (21) years, except in performance of a religious ceremony or service, or as provided by Ordinance.

**16. *Possession, Purchase, Dispensing, or Consumption of Alcoholic Liquor by Person of Non–Age; Proof of Age; Misrepresentation of Age.***

A. Any person to whom the sale, gift or delivery of any alcoholic liquor is prohibited because of age shall not purchase or accept a gift of alcoholic liquor or have same in his or her possession, except as provided by this Ordinance. This paragraph shall not prohibit the consumption of alcoholic liquor by a person of non-age in the performance of a religious service or ceremony, or consumption by a person of non-age under the direct supervision and approval of the parent(s) or legal guardian(s) of such person in the privacy of a home.

B. If a licensee, or his or her agent, or employee believes or has reason to believe, that a sale or delivery of any alcoholic liquor is prohibited because of the non-age of the prospective recipient, he or she shall, before making such sale or delivery, demand presentation of some form of positive identification, containing proof of age, issued by a public official in the performance of his official duties.

For the purpose of preventing the violation of this section, any licensee, or his agent or employee, may refuse to sell or serve alcoholic beverages to any person who is unable to produce adequate positive identification of identity and of the fact that he or she is the age of twenty-one (21) years or older.

Proof that the licensee, or his employee or agent, demanded, was shown and reasonably relied upon such positive identification in any transaction forbidden by this section, is competent evidence and may be considered in any prosecution or hearing therefore or in any proceedings for the suspension or revocation of any license based thereon.

### 17. *Presence of Unsupervised Persons under the Age of Twenty-one (21) Years.*

No person under the age of twenty-one (21) years of age shall be allowed to be present in any tavern unless that person is accompanied by a parent or legal guardian.

Any Village liquor licensee or his or her agent, or the parent or guardian of a person under the age of twenty-one (21) years who knowingly permits a person under the age of twenty-one (21) years to violate this provision shall, upon conviction, be fined no less than One Hundred ($100.00) Dollars nor more than One Thousand ($1,000.00) Dollars. Violation of this provision may also be the basis for revocation or suspension of any license pursuant to 19 below.

### 18. *Prohibition of Sale of Alcohol in Conjunction with an Adult Use.*

No licensee shall be allowed to sell alcoholic liquor in conjunction with an adult use on the premises. The following shall be considered adult uses for the purpose of this Ordinance:

A. Adult Book Stores: An establishment having as a substantial portion of its stock in trade, books, magazines, films for sale or viewing on the premises by use of motion pictures devices or any other coin operated means, and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing, or relating to "specified sexual activities" or "specified anatomical areas" or an establishment with a segment or section devoted to the sale or display of such material.

B. Adult Entertainment Cabaret: A public or private establishment which is licensed to serve food and/or beverages, which features topless dancers and/or waitresses, strippers, male or female impersonators, or similar entertainers engaged in "specified sexual activities" or displaying "specified anatomical areas."

C. Adult Motion Picture Theatre: An enclosed building used regularly and routinely for presenting motion pictures having a dominant theme material distinguished or characterized by an emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas" for observation by patrons thereon.

D. Body Shop or Model Studio: Any public or private establishment which describes itself as a body shop or model studio, or where for any form of consideration and gratuity, figure models who display "specified anatomical areas" are provided to be observed, sketched, drawn, painted, sculptured, photographed, or similarly depicted by persons paying such consideration or gratuity, or where for any form of consideration or gratuity, nude and seminude dancing, readings, counseling sessions, body painting, and other activities that present materials distinguished or characterized by an emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas" for observation by or communication to persons paying such consideration or gratuity.

For the purpose of this Ordinance, "specified anatomical areas" shall include any of the following conditions:

A. Less than completely and opaquely covered:

1. Human genitals, pubic region, or pubic hair;

2. Buttock; and

3. Female breast below a point immediately above the top of the areola.

B. Human male genitals in a discernibly turgid state, even if completely covered.

For the purpose of this Ordinance, "specified sexual activities" shall include any of the following conditions:

A. Human genitals in a state of sexual stimulation or arousal.

B. Acts or representations of acts of human masturbation, sexual intercourse or sodomy, bestiality, oral copulation, or flagellation.

C. Fondling or erotic touching of human genitals, pubic region, buttock, or female breast.

D. Excretory functions as part of or in connection with any activities set forth in subsections A through C of this definition.

### 19. *Revocation of License, Appeals.*

A. Any license issued hereunder may be canceled for failure to operate thereunder for thirty (30) or more consecutive days during the license period.

B. Any license may be revoked or suspended for violation of any of the liquor control regulations of the United States, the state liquor control commission, the county liquor commission or this Ordinance. Any license may also be revoked if the license holder continually permits his or her customers to conduct themselves in a disorderly manner. Three (3) instances of such disorderly conduct as might qualify under the criminal code as disorderly conduct, absent preventative measures being taken by the licensee, shall be prima facie evidence of the violation of this paragraph. Finally, any license may be revoked if it is found that the licensee willfully made false statements as to a material fact in order to facilitate obtaining said license or renewal.

C. Appeals of cancellations, suspensions or revocations may be taken to the State Commissioner as provided by 235 ILCS 511–1–1 et seq.

### 20. *Refund of Fees Paid.*

A. No refund of fees paid will be granted upon a license revoked for cause or voluntarily surrendered.

B. A refund of one-twelfth ($\frac{1}{12}$) of the fee paid will be paid to the Executor or Administrator of a deceased licensee for every calendar month that the license would have been effective had it not been terminated by Paragraph Five (5) of this Ordinance.

### 21. *Severability.*

The paragraphs and subparagraphs of this Ordinance are severable.

### 22. *Repeal of Conflicting Ordinances.*

Any other ordinances or resolutions of the Village which may contain provisions contrary to those in this Ordinance are hereby expressly revoked and shall be considered to be superseded by this Ordinance.

### 23. *Statement of Urgency.*

Pursuant to the provisions of 65 ILCS 5/1–2–4, two-thirds ($\frac{2}{3}$) of the corporate authorities of the Village do hereby declare and direct that it is urgent that this Ordinance take effect immediately upon passage by a two-thirds ($\frac{2}{3}$) vote of the corporate authorities of the Village and approval by the President.

PASSED AND ADOPTED by the President and the Board of Trustees of the Village of Mapleton, Peoria County, Illinois, this 9th day of June, 1998.

/s/Ken Odewalt

Village President

Recorded in the Village Ordinance Record on 6-9, 1998.

### APPENDIX II TO ORDER

### ORDINANCE NO. 98–03

### AN ORDINANCE ESTABLISHING LICENSING REGULATIONS FOR ADULT ENTERTAINMENT ESTABLISHMENTS

### VILLAGE OF MAPLETON PEORIA COUNTY, ILLINOIS

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| Section 1. | Recitals | 905 |
| Section 2. | Short Title | 905 |
| Section 3. | Definitions | 905 |
| | A. Adult Booth | 905 |
| | B. Adult Entertainment Establishment | 905 |

Page
 1. Adult Cabaret ................... 905
 2. Adult Store .................... 906
 3. Adult Theater .................. 906
 C. Adult Establishment Employee ...... 906
 D. Adult Establishment License ....... 906
 E. Adult Establishment Patron ........ 906
 F. Adult Material ................. 906
 G. Adult Use Commission ........ ..... 906
 H. Adult Use Commissioner ........... 906
 I. Board of Trustees ................ 906
 J. Commercial Establishment ......... 906
 K. Days ............................ 907
 L. Effective Date .................... 907
 M. Licensed Premises ................ 907
 N. Licensee ........................ 907
 O. Nude or State of Nudity ........... 907
 P. Reviewing Departments ........... 907
 Q. SemiNude ....................... 907
 R. Specified Anatomical Areas ........ 907
 S. Specified Criminal Act ............. 907
 T. Specified Sexual Activities .......... 908
 U. Straddle Dance ................... 908
 V. Zoning Ordinance ................. 908
Section 4. Adult Use Commissioner and Adult
 Use Commission .................... 908
 A. Adult Use Commissioner .......... 908
 B. Adult Use Commission ........ .... 908
 1. Creation ..................... 908
 2. Composition .................. 909
 3. Filing of Appointments ......... 909
 4. Duties ....................... 909
Section 5. Adult Establishment Licenses Gener-
 ally ................................. 909
 A. Adult Establishment License Re-
 quired .......................... 909
 B. Operation Without License Prohib-
 ited ............................ 909
 C. Operation in Violation of License
 Prohibited ...................... 909
 D. Content and Display of License ..... 909
 E. License Term .................... 909
 F. Existing Establishments ........... 910
 1. Application Generally ........... 910
 2. Required Compliance Effective
 Date ........................ 910
 G. Renewal ........................ 910
Section 6. Form and Submission of License Ap-
 plication ............... ........... 910
 A. Required Form .................. 910
 B. Administrative Processing Fee and
 Security ........................ 910
 1. Administrative Processing Fee ... 910
 2. Bond or other Security ......... 911
 C. Required Information and Docu-
 ments ......................... 911
 D. Incomplete Applications Returned ... 913
Section 7. Processing of License Application ....... 913
 A. Reviewing Departments ........... 913
 B. Reviewing Department Reports ..... 913
 C. Adult Use Commissioner Review ... 914
 D. Reliance on Diagram ............... 914
 E. Applicant Cooperation Required ..... 914
 F. Time for Issuance or Denial ......... 914
 G. Decision Final .................... 914
Section 8. Standards for Issuance or Denial of
 License .... .'................... 914
 A. Issuance ......................... 914
 B. Denial ........................... 915
 C. License Deemed To Be Issued ...... 916
Section 9. Inspections by the Village .............. 916
 A. Authority ........................ 916
 B. Licensee Cooperation .............. 916
 C. Interference or Refusal Illegal ....... 916
 D. Suspension or Revocation ........... 916
Section 10. Change in Information ............. ..... 916
Section 11. Regulations Applicable To All Adult
 Entertainment Establishments ........ 916
 A. General Compliance ................ 916
 B. Hours of Operation ................ 916

Page
 C. Animals ......................... 916
 D. Restrooms ....................... 916
 E. Restricted Access ................. 917
 F. Specific Prohibited Acts ............ 917
 G. Exterior Display ................... 917
 H. Signage Limitations ................ 917
 I. Noise ........................... 917
 J. Gambling and Related Devices
 Prohibited ...................... 917
 K. Manager's Station ................. 918
 L. Alcohol Prohibition ................ 918
Section 12. Special Regulations For Adult Booths ... 918
 A. Prohibited Except in Adult Stores ... 918
 B. Occupancy and Prohibited Acts ..... 918
 C. Open Booth Requirement .......... 918
 D. Aisle Required ................... 918
 E. Holes Prohibited .................. 918
 F. Signage ......................... 918
 G. Age Limitations .................. 918
Section 13. Special Regulations For Adult Caba-
 rets ............................... 919
 A. Performance Area ................. 919
 B. Lighting ......................... 919
 C. Tipping .......................... 919
 D. Notice of Select Rules ............. 919
 E. Age Limitations .................. 919
Section 14. Special Regulation For Adult Stores ..... 920
 A. Windows and Signs ............... 920
 B. Age Limitations .................. –920
Section 15. Special Regulations For Adult The-
 aters .............................. 920
 A. Seating .......................... 920
 B. Aisle ............................ 920
 C. Sign ............................ 920
 D. Age Limitations .................. 920
Section 16. Licensee Responsibility For Employ-
 ees ................................ 920
Section 17. License Revocation or Suspension ...... 921
 A. Grounds ......................... 921
 B. Procedure . ..................... 921
 1. Notice ....................... 921
 2. Hearing ...................... 922
 3. Notice and Effective Date of
 Suspension or Revocation ..... 922
 4. Surrender of License and Secu-
 rity ........................ 922
Section 18. Administrative Record .. ............. 922
Section 19. Employee Registration and Record-
 keeping by Licensee ................ 922
Section 20. Penalty ............................ 923
Section 21. Nuisance Declared .................... 923
Section 22. Computation of Time .................. 923
Section 23. Severability ......................... 923
Section 24. Effective Date ....................... 923

# VILLAGE OF MAPLETON, ILLINOIS

## ORDINANCE NO. ————

# AN ORDINANCE ESTABLISHING LICENSING REGULATIONS FOR ADULT ENTERTAINMENT ESTABLISHMENTS

WHEREAS, the staff of, and legal counsel for, the Village of Mapleton, Illinois (the "Village") have reviewed and analyzed numerous studies, reports, articles, judicial decisions, and the experience and legislative findings of other municipalities and counties in northern and central Illinois,

the Chicago metropolitan region, and around the country concerning the impacts, or "secondary effects," of sexually oriented businesses and the sale, distribution, and display of sexually oriented materials (collectively, "Sexually Oriented Business Activities") on the areas in which such Activities are located or take place; and

WHEREAS, Sexually Oriented Business Activities can cause or contribute significantly to increases in criminal activity in the areas in which they are located or take place, thereby taxing crime prevention, law enforcement, and public health services; and

WHEREAS, nude dancing and other similar conduct provided by Sexually Oriented Business Activities encourages prostitution, increases the frequency of sexual assaults, attracts or encourages other related criminal activity, increases the public health and safety risks associated with Sexually Oriented Business Activities, and otherwise causes or contributes significantly to the adverse impacts and secondary effects of Sexually Oriented Business Activities on the areas in which such Activities are located or take place; and

WHEREAS, Sexually Oriented Business Activities can cause or contribute significantly to the deterioration of residential neighborhoods, can impair the character and quality of such neighborhoods and the housing located therein, and can inhibit the proper maintenance and growth of residential neighborhoods, limiting or reducing the availability of quality, affordable housing for area residents and reducing the value of property in such areas; and

WHEREAS, Sexually Oriented Business Activities can undermine the stability of other established business and commercial uses in the areas in which Sexually Oriented Business Activities are located or take place and can cause or contribute significantly to the deterioration of such business and commercial uses, thereby causing or contributing to a decline in such uses, an inhibition on business and commercial growth, and a resulting adverse impact on local government revenues and property values; and

WHEREAS, Sexually Oriented Business Activities can have a dehumanizing and distracting influence on young people and students attending schools, can diminish or destroy the enjoyment and family atmosphere of parks, playgrounds, forest preserves, and other public recreational areas, can interfere with or even destroy the spiritual experience of attending church, synagogue, or other places of worship, and can interfere with or even destroy the opportunity for solemn and respectful contemplation at cemeteries and similar facilities; and

WHEREAS, the presence of Sexually Oriented Business Activities is perceived by the public and by neighboring business owners and residents as an indication that the area in which such Activities occur or take place is in decline and deteriorating, a perception that can quickly lead to such decline and deterioration, prompting businesses and residents to flee the affected area to avoid the consequences of such decline and deterioration; and

WHEREAS, the exterior appearances, including signage, of Sexually Oriented Business Activities can have an adverse impact on young people and students, can contribute to the decline in property values associated with Sexually Oriented Business Activities, and can otherwise cause or contribute significantly to the adverse impacts and secondary effects of Sexually Oriented Business Activities on the areas in which such Activities are located or take place; and

WHEREAS, the conduct of Sexually Oriented Business Activities, including specifically, but without limitation, adult cabarets that provide nude dancing and other similar conduct and the operation and use of adult booths, often encourages or allows sexual activities and prostitution, among other things, that place employees and patrons of such businesses at risk to exposure and contraction of sexually transmitted diseases, including specifically, but

without limitation, the HIV virus, Acquired Immune Deficiency Syndrome, and venereal diseases; and

WHEREAS, the President and Board of Trustees of the Village have determined that Sexually Oriented Business Activities will, unless properly regulated, have these and other severe adverse impacts and secondary effects on the Village and its residents; and

WHEREAS, for the reasons set forth above, among others, the President and Board of Trustees have found and determined that it is essential to the health, safety, and general welfare of the Village and its residents to adopt comprehensive licensing regulations relating to Sexually Oriented Business Activities, to the distribution and display of sexually oriented materials, and to the types and operations of sexually oriented businesses that may locate in the Village; and

WHEREAS, the President and Board of Trustees have further found and determined that the regulations established pursuant to this Ordinance, including specifically, but without limitation, the prohibition on nude dancing, the prohibition on sexual contact between patrons and employees, and the prohibition on "straddle dances," are necessary to address, mitigate, and, if possible, eliminate the occurrence of prostitution, sexual assaults, and other related criminal activity and public health and safety risks related to or caused by Sexually Oriented Business Activities; and

WHEREAS, the President and Board of Trustees have further found and determined that the establishment of the regulations established pursuant to this Ordinance on the operation, maintenance, and structural aspects of Sexually Oriented Business Activities is necessary to minimize to the greatest extent possible, or to eliminate altogether, the public health and safety risks that customarily, but unnecessarily, exist in connection with such Activities; and

WHEREAS, the President and Board of Trustees have further found and deter-

mined that the adult establishment age limitations and employee licensing requirements of this Ordinance are necessary to address, mitigate, and, if possible, eliminate the adverse impacts and secondary effects of Sexually Oriented Business Activities on the areas in which such Activities are located or take place and on the persons who are exposed to those Activities, to ensure that these Activities are established, managed, and operated in a safe and legal manner at all times, and to ensure that the unnecessary public health risks associated with Sexually Oriented Business Activities are minimized to the greatest extent possible, or eliminated altogether; and

WHEREAS, the President and Board of Trustees have further found and determined that the limitations on the hours of operation of Sexually Oriented Business Activities set forth in this Ordinance are necessary to protect and secure neighboring uses, to control adverse noise and traffic impacts associated with Sexually Oriented Business Activities, to enhance enforcement and implementation of the regulations set forth herein, and to otherwise address, mitigate and, if possible, eliminate the adverse impacts and secondary effects of Sexually Oriented Business Activities; and

WHEREAS, the President and Board of Trustees have further found and determined that the disclosure and background information requirements set forth in this Ordinance relating to the owners, operators, managers, employees, and others in a position of control over Sexually Oriented Business Activities are necessary in order for the Village to implement and enforce the terms and conditions of this Ordinance, to aid in the prevention of crime related to Sexually Oriented Business Activities, to minimize to the greatest extent possible, or eliminate altogether, the public health risks associated with Sexually Oriented Business Activities, and to otherwise carry out the purposes and objectives of the regulations established herein; and

WHEREAS, the regulations established pursuant to this Ordinance are in no way based on the content of any protected speech associated with Sexually Oriented Business Activities, and the purpose and intent of the regulations established pursuant to this Ordinance is not to restrict or prohibit protected speech associated with Sexually Oriented Business Activities, but rather is to address, mitigate, and, if possible, eliminate the adverse impacts and secondary effects of Sexually Oriented Business Activities on the areas in which such Activities are located or take place and to ensure that these Activities are established, managed, and operated in a safe and legal manner at all times; and

WHEREAS, the Village has for many years engaged in rigorous, firm, and effective policies and regulations relating to uses and activities that could have adverse impacts on the continued stability and vitality of the residential and business areas of the Village, and the regulations imposed by this Ordinance are a continuation of, and consistent with, those long-standing policies and regulations; and

WHEREAS, in light of additional legal standards for regulating Sexually Oriented Business Activities provided by the U.S. Supreme Court and the lower federal and state appellate courts, as well as the practical knowledge and experience gained by other municipalities and counties in Illinois and around the country, the President and Board of Trustees have found and determined that it is necessary to further supplement and amend the Village's current business regulations with the regulations set forth in this Ordinance; and

WHEREAS, the Village has the power and authority to adopt and enforce the terms, conditions, and regulations established in this Ordinance pursuant to (i) its general police powers to protect the public health, safety, morals, and general public welfare; (ii) the provisions of Sections 11–42–5, 11–51–1, and 11–60–2 of the Illinois Municipal Code, 64 ILCS 5/11–42–5, 11–51–1, and 11–60–2; (iii) the provisions of Section 4–1 *et seq.* of the Liquor Control Act of 1934, 235 ILCS 5/4–1 *et seq.*; and (iv) all other applicable provisions of law;

NOW, THEREFORE, BE IT ORDAINED BY THE PRESIDENT AND BOARD OF TRUSTEES OF THE VILLAGE OF MAPLETON, ILLINOIS, as follows:

*Section 1. Recitals.*

The foregoing recitals are incorporated herein as the findings and determinations of the President and Board of Trustees.

*Section 2. Short Title.*

This Ordinance shall be known as, and may be referred to as, the "Mapleton Adult Use Licensing Ordinance."

*Section 3. Definitions.*

For the purposes of this Ordinance, the following terms, phrases, and words shall have the meanings given herein.

A. *Adult Booth.* Any area of an Adult Entertainment Establishment set off from the remainder of such Establishment by one or more walls or other dividers or partitions and used to show, play, or otherwise demonstrate any Adult Materials or to view any live performance that is distinguished or characterized by an emphasis on the exposure, depiction, or description of Specified Anatomical Areas or the conduct or simulation of Specified Sexual Activities.

B. *Adult Entertainment Establishment.* Any of the following Commercial Establishments, as defined herein:

1. Adult Cabaret. Any Commercial Establishment that as a substantial or significant portion of its business features or provides any of the following:

 (a) Persons who appear Semi–Nude.

 (b) Live performances that are distinguished or characterized by an emphasis on the exposure, depiction, or description of Specified Anatomical Areas or the conduct

or simulation of Specified Sexual Activities.

(c) Films, motion pictures, video or audio cassettes, slides, computer displays, or other visual representations or recordings of any kind that are distinguished or characterized by an emphasis on the exposure, depiction, or description of Specified Anatomical Areas, or the conduct or simulation of Specified Sexual Activities.

2. Adult Store. Any Commercial Establishment (a) that contains one or more Adult Booths; (b) that as a substantial or significant portion of its business offers for sale, rental, or viewing any Adult Materials; or (c) that has a segment or section devoted to the sale or display of Adult Materials.

3. Adult Theater. Any Commercial Establishment that as a substantial or significant portion of its business features or provides (i) films, motion pictures, video or audio cassettes, slides, or other visual representations or recordings that are distinguished or characterized by an emphasis on the exposure, depiction, or description of Specified Anatomical Areas, or the conduct or simulation of Specified Sexual Activities; or (ii) live performances that are distinguished or characterized by an emphasis on the exposure, depiction, or description of Specified Anatomical Areas or the conduct or simulation of Specified Sexual Activities.

C. *Adult Establishment Employee.* Any individual, including an entertainer, who works in or at, or renders any services directly related to the operation of, an Adult Entertainment Establishment; provided, however, that this definition shall not include persons delivering goods, materials (other than Adult Materials), food and beverages, or performing maintenance or repairs, to the Licensed Premises.

D. *Adult Establishment License.* A license issued for an Adult Entertainment Establishment pursuant to the provisions of this Ordinance.

E. *Adult Establishment Patron.* Any individual, other than an Adult Establishment Employee, present in or at any Adult Entertainment Establishment at any time when such Adult Entertainment Establishment is open for business; provided, however, that this definition shall not include persons delivering goods, materials (other than Adult Materials), food and beverages, or performing maintenance or repairs, to the Licensed Premises.

F. *Adult Material.* Any of the following, whether new or used:

1. (a) Books, magazines, periodicals, or other printed matter, or digitally-stored materials; or

 (b) Films, motion pictures, video or audio cassettes, slides, computer displays, or other visual representations or recordings of any kind,

 that are distinguished or characterized by an emphasis on the exposure, depiction, or description of Specified Anatomical Areas, or the conduct or simulation of Specified Sexual Activities.

2. Instruments, novelties, devices, or paraphernalia that are designed for use in connection with Specified Sexual Activities, or that depict or describe Specified Anatomical Areas.

G. *Adult Use Commission.* A commission appointed by the Adult Use Commissioner pursuant to Section 4 of this Ordinance.

H. *Adult Use Commissioner.* The President of the Village, pursuant to Section 4 of this Ordinance.

I. *Board of Trustees.* The Board of Trustees of the Village of Mapleton.

J. *Commercial Establishment.* Any place where admission, services, performances, or products are provided

for or upon payment of any form of consideration.

K. *Days.* Calendar days, unless otherwise specifically set forth in this Ordinance.

L. *Effective Date.* The Effective Date shall be deemed to be *[insert date 10 days after publication of ordinance].*

M. *Licensed Premises.* The place or location described in an Adult Establishment License where an Adult Entertainment Establishment is authorized to operate. No sidewalks, streets, parking areas, public rights-of-way, or grounds adjacent to any such place or location shall be included within the Licensed Premises.

N. *Licensee.* Any person or entity that has been issued an Adult Establishment License pursuant to the provisions of this Ordinance.

O. *Nude or State of Nudity.* A state of dress or undress that exposes to view (i) less than completely and opaquely covered human genitals; pubic region; anus; or female breast below a point immediately above the top of the areolae, but not including any portion of the cleavage of the female breast exhibited by a dress, blouse, shirt, leotard, bathing suit, or other wearing apparel, provided the areolae is not exposed; or (2) human male genitals in a discernibly turgid state, even if completely and opaquely covered, or any device or covering that, when worn, simulates human male genitals in a discernibly turgid state.

P. *Reviewing Departments.* Those Village departments or persons on the Village staff, or persons retained by the Village, designated by the Village President from time-to-time to review applications submitted pursuant to this Ordinance.

Q. *Semi–Nude.* A state of dress or undress in which clothing covers no more than the genitals, pubic region, anus, and areolae of the female breast, as well as portions of the body covered by supporting straps or devices or by other minor accessory apparel such as hats, gloves, and socks.

R. *Specified Anatomical Areas.* Any of the following:

1. Less than completely and opaquely covered human genitals; pubic region; buttocks; anus; or female breast below a point immediately above the top of the areolae, but not including any portion of the cleavage of the female breast exhibited by a dress, blouse, shirt, leotard, bathing suit, or other wearing apparel, provided the areolae is not exposed.

2. Human male genitals in a discernibly turgid state, even if completely and opaquely covered, or any device or covering that, when worn, simulates human male genitals in a discernibly turgid state.

S. *Specified Criminal Act.* Any unlawful lewd, indecent, or immoral conduct, including specifically, but without limitation, any of the lewd, indecent, or immoral criminal acts specified in any of the following statutes:

1. Article II of the Illinois Criminal Code (sex offenses).

2. Section 26–4 of the Illinois Criminal Code, 720 ILCS 5/330 (unauthorized videotaping).

3. Section 33D–1 of the Illinois Criminal Code, 720 ILCS 5/330–1 (contributing to the criminal delinquency of a juvenile).

4. The Obscene Phone Call Act, 720 ILCS 135/0.01 *et seq.*

5. The Wrongs to Children Act, 720 ILCS 150/0.01 *et seq.*

6. The Improper Supervision of Children Act, 720 ILCS 640/0.01 *et seq.*

7. The Sale of Immoral Publications to Children Act, 720 ILCS 670/0.01 *et seq.*

8. The Cannabis Control Act, 720 ILCS 550/1 *et seq.*

9. The Illinois Controlled Substances Act, 720 ILCS 570/100 et seq.

T. *Specified Sexual Activities.* Any of the following:

1. Fondling or other erotic touching of human genitals, pubic region, buttocks, anus, or female breasts.

2. Sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation, or sodomy.

3. Masturbation, actual or simulated.

4. Human genitals in a state of sexual stimulation, arousal, or tumescence.

5. Excretory functions as part of or in connection with any of the activities set forth in Paragraphs 1, 2, 3, or 4 of this definition.

U. *Straddle Dance.* The use by any person, including specifically, but without limitation, an Adult Establishment Employee, of any part of his or her body to touch the genitals, pubic region, buttock, anus, or female breast of any Adult Establishment Patron or any other person, or the touching of the genitals, pubic region, buttock, anus, or female breast of any person by any Adult Establishment Patron. Conduct shall be a "Straddle Dance" regardless of whether the "touch" or "touching" occurs while the person is displaying or exposing any Specified Anatomical Area. Conduct shall also be a "Straddle Dance" regardless of whether the "touch" or "touching" is direct or through a medium. Conduct commonly referred to by the slang terms "lap dance," "table dance," and "face dance" shall be included within this definition of Straddle Dance.

V. *Zoning Ordinance.* The ordinance known and referred to as the "Zoning Ordinance of the Village of Mapleton, Illinois," as it may be amended from time-to-time.

*Section 4. Adult Use Commissioner and Adult Use Commission.*

A. *Adult Use Commissioner.* The President of the Village is hereby designated as the Adult Use Commissioner pursuant to the terms and conditions of this Ordinance. The Adult Use Commissioner shall have the following powers and duties:

1. To administer and rule upon the applications for, and the issuance, renewal, suspension, and revocation of, Adult Establishment Licenses as set forth in this Ordinance.

2. To conduct or provide for such inspections of Adult Entertainment Establishments as shall be necessary to determine and ensure compliance with the provisions of this Ordinance and other applicable provisions of law.

3. To periodically review the provisions of this Ordinance and the conduct and operation of Adult Entertainment Establishments and Adult Establishment Licensees, and to make such related reports and recommendations to the Board of Trustees as the Adult Use Commissioner shall deem necessary.

4. To appoint Members of the Board of Trustees to serve on the Adult Use Commission as set forth in Subsection B of this Section.

5. To direct the Adult Use Commission to conduct such hearings, studies, and reports on Adult Entertainment Establishments, and the regulations relating thereto, as the Adult Use Commissioner shall deem necessary.

6. To take such further actions as the Adult Use Commissioner shall deem necessary to carry out the purposes and intent of this Ordinance and to exercise such additional powers in furtherance thereof as are implied or incident to those powers and duties expressly set forth in this Ordinance.

B. *Adult Use Commission.*

1. Creation. A Commission, to be known as the "Adult Use Commission," is hereby created and established for the purposes set forth in this Ordinance.

2. Composition. The Adult Use Commissioner may appoint one or more current Members of the Board of Trustees to serve at the will of the Adult Use Commissioner and to advise the Adult Use Commissioner on matters relating to the implementation and enforcement of the regulations set forth in this Ordinance and to the exercise of the Adult Use Commissioner's powers and duties under this Ordinance. The person or persons appointed by the Adult Use Commissioner, along with the Adult Use Commissioner, shall comprise the Adult Use Commission.

3. Filing of Appointments. The Adult Use Commissioner shall file a written appointment of each of the members of the Adult Use Commission in the Office of the Village Clerk.

4. Duties. The Adult Use Commission shall have the following powers and duties:

 a. To recommend to the Adult Use Commissioner such further regulations regarding Adult Entertainment Establishments and Adult Establishment Licenses as the members of the Commission may deem necessary to protect the public health, safety, and welfare or to otherwise carry out the purposes and objectives of the regulations established pursuant to this Ordinance.

 b. To conduct and prepare hearings, studies, and reports upon matters referred to the Commission by the Adult Use Commissioner and to make such reports and recommendations relating thereto as are requested by the Adult Use Commissioner.

 c. To conduct such hearings on the revocation or suspension of an Adult Establishment License as required pursuant to Section 17 of this Ordinance.

*Section 5. Adult Establishment Licenses Generally.*

A. *Adult Establishment License Required.* An Adult Establishment License shall be required to establish, operate, or maintain an Adult Entertainment Establishment within the Village.

B. *Operation Without License Prohibited.* Except as provided in Subsection F of this Section with regard to Adult Entertainment Establishments existing prior to the effective date of this Ordinance, it shall be unlawful for any person not having a current and valid Adult Establishment License to establish, operate, or maintain an Adult Entertainment Establishment within the Village at any time after the effective date of this Ordinance.

C. *Operation in Violation of License Prohibited.* It shall be unlawful for any Licensee to establish, operate, or maintain an Adult Entertainment Establishment within the Village except in the manner authorized by, and in compliance with, the provisions of this Ordinance and the Licensee's Adult Establishment License.

D. *Content and Display of License.* Every Adult Establishment License shall be provided by the Village and shall prominently state on its face, among other things the name of the Licensee, the expiration date, and the address of the Adult Entertainment Establishment. Every Licensee shall cause the Licensee's Adult Establishment License to be framed, covered by glass, and hung at all times in plain view in a conspicuous place on the Licensed Premises so that it can be seen and read easily at any time by any person entering the Licensed Premises.

E. *License Term.* Except as hereinafter provided, Adult Establishment Licenses shall be operative and valid, unless first terminated, suspended, or revoked, for a term of one year commencing on January 1 of the year

following the year of issuance and terminating on December 31 of that same year. Adult Establishment Licenses issued after January 1 of any year for operations to commence in that year shall be operative and valid, unless first terminated, suspended, or revoked, for a term commencing on the date of issuance and terminating on December 31 of that same year.

F. *Existing Establishments.*

1. Application Generally. An Adult Entertainment Establishment existing and operating on or prior to the Effective Date ("Existing Establishment") may continue to exist and operate as of the Effective Date; provided, however, that the Existing Establishment (i) shall submit an application for an Adult Establishment License not later than *[insert date, 60 days after Effective Date]*; (ii) shall cease operations on *[insert date, 120 days after Effective Date]* (the "Licensure Date"), unless it has secured an Adult Establishment License by the Licensure Date; and (iii) shall comply with, and continue at all times to comply with, the requirements of Paragraph 2 of this Subsection F.

2. Required Compliance on Effective Date. An Existing Establishment shall, as of the Effective Date, be subject to the provisions of Sections 9, 11.A through 11.C, 11.E through 11.J, 11.L, 12.A, 12.B, 12.F, 12.G, 13.C through 13.E, 14, and 15, and shall at all times continue in compliance with said provisions.

G. *Renewal.* An Adult Establishment License may be renewed only by making application as required for an initial License pursuant to Section 6 of this Ordinance. Application for renewal shall be made at least 30 days before the expiration of the then-current License term. The expiration of the License shall not be affected or extended by a renewal application that is made less than 30 days before expiration.

*Section 6. Form and Submission of License Application.*

A. *Required Form.* An application for an Adult Establishment License, or the renewal thereof, shall be made in writing to the Adult Use Commissioner and submitted to the Village Clerk on a form prescribed by the Adult Use Commissioner and shall be signed (i) by the applicant, if the applicant is an individual; (ii) by at least one of the persons entitled to share in the profits of the organization and having unlimited personal liability for the obligations of the organization and the right to bind all other such persons, if the applicant is a partnership (general or limited), joint venture, or any other type of organization where two or more persons share in the profits and liabilities of the organization; (iii) by a duly authorized agent, if the applicant is a corporation; or (iv) by the trustee, if the applicant is a land trust. The application shall be verified by oath or affidavit as to all statements made on or in connection with the application and any attachments thereto. Each application shall specifically identify the applicant and the Licensed Premises for which an Adult Establishment License is sought. Each initial or renewal application shall be accompanied by seven identical copies.

B. *Administrative Processing Fee and Security.*

1. Administrative Processing Fee. Every applicant for an Adult Establishment License or for the renewal of an existing Adult Establishment License shall pay an Administrative Processing Fee in the amount of $100 by certified check to the Village at the time of filing such application. The Administrative Processing Fee shall in all cases be non-refundable

and shall be deposited in the general corporate fund of the Village.

2. Bond or Other Security. Each Adult Establishment License, and any renewals thereof, shall be conditioned on the acquisition and maintenance in good standing by the applicant and Licensee of a surety bond or other similar security in favor of the Village in the amount of $2,500 to the Village. Before an Adult Establishment License may be issued, the applicant shall furnish such bond or security, and before an Adult Establishment License is renewed or reinstated following revocation or suspension, the Licensee shall submit evidence that the bond or other security, in the amount required pursuant hereto, remains in full force and effect. The bond or other security, or part thereof, for an Adult Entertainment Establishment shall be forfeited automatically pursuant to Paragraph 17.B.4 of this Ordinance in order to reimburse the Village for the Village's costs in association with the proceedings related to any suspension or revocation of the License.

C. *Required Information and Documents.* Each application shall include the following information and documents:

1. (a) Individuals: The applicant's legal name, all of the applicant's aliases, the applicant's business address and social security number, written proof of the applicant's age, the citizenship and place of birth of the applicant and, if a naturalized citizen, the time and place of the applicant's naturalization.

(b) Corporations: The applicant corporation's complete name and official business address; the legal name, all aliases, and the ages, business addresses, and social security numbers of all of the directors, officers, and managers of the corporation and of every person owning or controlling more than 50 percent of the voting shares of the corporation; the corporation's date and place of incorporation and the objects for which it was formed; proof that the corporation is a corporation in good standing and authorized to conduct business in the State of Illinois; and the name of the registered corporate agent and the address of the registered office for service of process.

(c) Partnerships (general or limited), joint ventures, or any other type of organization where two or more persons share in the profits and liabilities of the organization: The applicant organization's complete name and official business address; the legal name, all aliases, and the ages, business addresses, and social security numbers of each partner (other than limited partners) or any other person entitled to share in the profits of the organization, whether or not any such person is also obligated to share in the liabilities of the organization.

(d) Land trusts: The applicant land trust's complete name; the legal name, all aliases, and the business address of the trustee of the land trust; the legal name, all aliases, and the ages, business addresses, and social security numbers of each beneficiary of the land trust and the specific interest of each such beneficiary in the land trust; and the interest, if any, that the land trust holds in the Licensed Premises.

2. If a corporation or partnership is an interest holder that must be disclosed pursuant to Subparagraph 6.C.1(b) or 6.C.1(c) above, then such interest holders shall disclose the information required in said Subparagraphs with respect to their interest holders.

3. The general character and nature of the business of the applicant.

4. The length of time that the applicant has been in the business of the character specified in response to Paragraph 3 above.

5. The location, including street address and legal description, and telephone number, of the premises for which the Adult Establishment License is sought.

6. The specific name of the business that is to be operated under the Adult Establishment License.

7. The identity of each fee simple owner of the Licensed Premises, and evidence of a lease, license, or other proper authority evidencing the right of the applicant to use the Licensed Premises for the proposed Adult Entertainment Establishment.

8. A diagram showing the internal and external configuration of the Licensed Premises, including all doors, windows, entrances, exits, the fixed structural internal features of the Licensed Premises, plus the interior rooms, walls, partitions, stages, performance areas, and restrooms. A professionally prepared diagram in the nature of an engineer's or architect's blueprint shall not be required; provided, however, that each diagram shall be oriented to the north or to some designated street or object and shall be drawn to a designated scale or with marked dimensions to an accuracy of plus or minus six inches and sufficient to show clearly the various interior dimensions of all areas of the Licensed Premises and to demonstrate compliance, either alone or in conjunction with such other documentation as the applicant shall submit, with the Americans with Disabilities Act and the Illinois Accessability Code and with the other provisions of this Ordinance. The requirements of this Paragraph shall not apply for renewal applications if the applicant adopts a diagram that was previously submitted for the License sought to be renewed and if the Licensee certifies that the Licensed Premises has not been altered since the immediately preceding issuance of the License and that the previous diagram continues to accurately depict the exterior and interior layouts of the Licensed Premises. The approval or use of the diagram required pursuant to this Paragraph shall not be deemed to be, and shall not be interpreted or construed to constitute, any other Village approval otherwise required pursuant to applicable Village ordinances and regulations.

9. The names of each governmental body from which, within five years immediately prior to the date of the present application, the applicant, or any of the individuals identified in the application pursuant to Paragraphs 1 or 2 of this Subsection, has received a license or other authorization to conduct or operate a business (a) substantially the same as an Adult Entertainment Establishment, and the names and addresses of each such business; (b) requiring a federal, state, or local liquor license; or (c) requiring a federal, state, or local gaming license.

10. The specific type or types of Adult Entertainment Establishment(s) that the applicant proposes to operate in the Licensed Premises.

11. A copy of each Adult Establishment License, liquor license, and gaming license currently held by the applicant, or any of the individuals identified in the application pursuant to Paragraphs 1 or 2 of this Subsection.

12. Whether the applicant, or any of the individuals identified in the application pursuant to Paragraphs 1

or 2 of this Subsection, has been, within five years immediately preceding the date of the application, convicted of, or pleaded *nolo contendere* to, any Specified Criminal Act. As to each conviction, the applicant or other individual shall provide the conviction date, the case number, the nature of the misdemeanor or felony violation(s) or offense(s), and the name and location of the court.

13. Whether the applicant, or any of the individuals identified in the application pursuant to Paragraphs 1 or 2 of this Subsection, has had a license or other authorization to conduct or operate a business substantially the same as an Adult Entertainment Establishment or any business requiring either a liquor or gaming license, revoked or suspended, and, if so, the date and grounds for each such revocation or suspension, and the name and location of the establishment at issue.

14. The name of the individual or individuals who shall be the day-to-day, on-site managers of the proposed Adult Entertainment Establishment. If the manager is other than the applicant, the applicant shall provide, for each manager, all of the information required pursuant to Subparagraph 1(a), and Paragraphs 9, 11, 12, and 13 of this Subsection.

15. For the individual or individuals executing the application pursuant to Subsection 6.A of this Ordinance, and the individual or individuals identified pursuant to Paragraph 6.C.14 of this Ordinance, a fully executed waiver on a form prescribed by the Village to obtain criminal conviction information pursuant to the Illinois Uniform Conviction Information Act.

D. *Incomplete Applications Returned.* Any application for an Adult Establishment License that does not include all of the information and documents required pursuant to Subsection C of this Section as well as the Administrative Processing Fee and bond or other security required pursuant to Subsection B of this Section, shall be deemed to be incomplete and shall not be acted on or processed by the Village. The Adult Use Commissioner shall, within five days after such submission, return the incomplete application to the applicant along with a written explanation of the reasons why the application is incomplete.

*Section 7. Processing of License Application.*

A. *Reviewing Departments.* Within three days after receipt of a complete application for an Adult Establishment License that includes all of the information and documents required pursuant to Subsection 6.C of this Ordinance, as well as the Administrative Processing Fee and bond or other security required pursuant to Subsection 6.B of this Ordinance, the Village Clerk shall transmit, or cause to be transmitted, a copy of the application to the Reviewing Departments.

B. *Reviewing Department Reports.* Each of the Reviewing Departments shall, within 25 days after transmittal of the application thereto, or within such other period of time as the Village and the applicant may otherwise agree, (i) review the application; (ii) conduct such inspections of the proposed Licensed Premises and background investigations of the applicant and any of the individuals identified in the application pursuant to Paragraphs 6.C.1, 6.C.2, or 6.C.14 of this Ordinance, regarding matters within their respective jurisdictions, as shall be reasonably necessary to verify the information set forth in the application and to determine whether the proposed Adult Entertainment Establishment and Licensed Premises comply

with the requirements of this Ordinance and other applicable laws, codes, ordinances, rules, and regulations; and (iii) prepare and submit to the Adult Use Commissioner a written report regarding the results and findings of such reviews, inspections, and investigations.

C. *Adult Use Commissioner Review.* The Adult Use Commissioner shall also conduct such inspections and investigations as the Adult Use Commissioner shall deem reasonably necessary to verify the information set forth in the application and to determine whether the proposed Adult Entertainment Establishment and Licensed Premises comply with the requirements of this Ordinance and other applicable laws, codes, ordinances, rules, and regulations.

D. *Reliance on Diagram.* In the event that the Licensed Premises has not yet been constructed or reconstructed to accommodate the proposed Adult Entertainment Establishment, the Adult Use Commissioner and the Reviewing Departments shall base their respective written reports, investigations, and inspections to the extent necessary, on the diagram submitted pursuant to Paragraph 6.C.8 of this Ordinance. Any Adult Establishment License issued prior to the construction or reconstruction necessary to accommodate the proposed Adult Entertainment Establishment shall contain a condition that the Adult Entertainment Establishment shall not open for business until the Licensed Premises has been inspected and determined to be in substantial compliance with the diagram submitted with the application.

E. *Applicant Cooperation Required.* An applicant for an Adult Establishment License shall cooperate fully in the inspections and investigations conducted pursuant to this Ordinance by the Adult Use Commissioner and the Reviewing Departments. The Applicant's failure or refusal (i) to give any information reasonably relevant to the investigation of the application; (ii) to allow the Licensed Premises to be inspected; (iii) to appear at any reasonable time and place for examination under oath regarding the application; or (iv) to otherwise cooperate with the investigation and inspection required by this Ordinance, shall constitute an admission by the applicant that the applicant is ineligible for an Adult Establishment License and shall be grounds for denial of the License by the Adult Use Commissioner.

F. *Time for Issuance or Denial.* The Adult Use Commissioner shall, within 30 days after submission of a properly completed application, or within such other period of time as the Village and the applicant shall otherwise agree, either issue an Adult Establishment License pursuant to the provisions of Subsection 8.A of this Ordinance or deny issuance of the Adult Establishment License pursuant to the provisions of Subsection 8.B of this Ordinance. The Adult Use Commissioner shall issue or deny the License within said 30–day period, or such other period of time as shall have been agreed to by the Village and the applicant, regardless of whether or not the Adult Use Commissioner has received all of the Reviewing Department reports.

G. *Decision Final.* The action taken by the Adult Use Commissioner to issue or deny an Adult Establishment License pursuant, respectively, to Subsections 8.A and 8.B of this Ordinance shall be final and shall be subject to judicial review.

*Section 8. Standards for Issuance or Denial of License.*

A. *Issuance.* The Adult Use Commissioner shall issue an Adult Establishment License to an applicant if, but only if, the Adult Use Commissioner finds and determines all of the following, based

on the reports, investigations, and inspections conducted by the Adult Use Commissioner and the Reviewing Departments and on any other credible information on which it is reasonable for the Adult Use Commissioner to rely:

1. All information and documents required by Section 8 of this Ordinance for issuance of an Adult Establishment License have been properly provided and the material statements made in the application are true and correct.

2. For Adult Stores and Adult Theaters, all persons identified in the application pursuant to Paragraphs 6.C.1, 6.C.2, or 6.C.14 of this Ordinance are at least 18 years of age and not under any legal disability. For Adult Cabarets, all persons identified in the application pursuant to Paragraphs 6.C.1, 6.C.2, or 6.C.14 of this Ordinance are at least 21 years of age and not under any legal disability.

3. No person identified in the application pursuant to Paragraphs 6.C.1, 6.C.2, or 6.C.14 of this Ordinance has been convicted of, or pleaded *nolo contendere* to, any Specified Criminal Act within five years immediately preceding the date of the application.

4. No person identified in the application pursuant to Paragraphs 6.C.1, 6.C.2, or 6.C.14 of this Ordinance has been convicted of, or pleaded *nolo contendere* to, any violation of a provision of this Ordinance within five years immediately preceding the date of the application.

5. No person identified in the application pursuant to Paragraphs 6.C.1, 6.C.2, or 6.C.14 of this Ordinance is overdue on payment to the Village of taxes, fees, fines, or penalties assessed against, or imposed on, any such individual in connection to any Adult Entertainment Establishment.

6. No person identified in the application pursuant to Paragraphs 6.C.1, 6.C.2, or 6.C.14 of this Ordinance is residing with, or married to, a person (i) who has been denied an Adult Establishment License within 12 months immediately preceding the date of the application, (ii) whose Adult Establishment License has been revoked within 12 months immediately preceding the date of the application, or (iii) whose Adult Establishment License is under suspension at the time of application.

7. The Adult Entertainment Establishment and the Licensed Premises, and the proposed operation of the Adult Entertainment Establishment, comply with all then-applicable building, health, and life safety codes and regulations and have received all necessary zoning approvals required pursuant to the then-applicable provisions of the Village Zoning Ordinance.

8. The applicant has confirmed in writing and under oath as part of the application that the applicant has read this Ordinance and all provisions of the Village Zoning Ordinance applicable to Adult Entertainment Establishments, that the applicant is familiar with their terms and conditions, and that the Licensed Premises and the proposed Adult Entertainment Establishment and its proposed operation are and shall be in compliance therewith.

B. *Denial.* If the Adult Use Commissioner determines that the applicant has not met any one or more of the conditions set forth in Subsection A of this Section, then the Adult Use Commissioner shall deny issuance of the Adult Establishment License and shall give the applicant a written notification and explanation of such denial. The Adult Use Commissioner's notice of denial shall be delivered in person or by

certified U.S. mail, postage prepaid, return receipt requested, addressed to the applicant's address as set forth in the application. The Adult Establishment License shall be deemed denied on the day that the notice of denial is delivered in person or three days after it is placed in the U.S. mail as provided in this Subsection.

C. *License Deemed To Be Issued.* If the Adult Use Commissioner does not issue or deny the Adult Establishment License within 30 days after the properly completed application is submitted, then the Adult Establishment License applied for shall be deemed to have been issued.

*Section 9. Inspections by the Village.*

A. *Authority.* The Adult Use Commissioner and other Village representatives and departments with jurisdiction shall periodically inspect all Adult Entertainment Establishments as shall be necessary to determine compliance with the provisions of this Ordinance and all other applicable law.

B. *Licensee Cooperation.* A Licensee shall permit representatives of the Village to inspect the Licensed Premises and the Adult Entertainment Establishment for the purpose of determining compliance with the provisions of this Ordinance and all other applicable law at any time during which the Licensed Premises is occupied or the Adult Entertainment Establishment is open for business.

C. *Interference or Refusal Illegal.* It shall be unlawful for the Licensee, any Adult Establishment Employee, or any other person to prohibit, interfere with, or refuse to allow, any lawful inspection conducted by the Village pursuant to this Ordinance or any other authority.

D. *Suspension or Revocation.* Any such prohibition, interference, or refusal shall be grounds for suspension or revocation of the Adult Establishment License pursuant to Section 17 of this Ordinance.

*Section 10. Change in Information.*

During the pendency of any application for, or during the term of, any Adult Establishment License, the applicant or Licensee shall promptly notify the Adult Use Commissioner in writing (i) of any change in any material information given by the applicant or Licensee in the application for such License, including specifically, but without limitation, any change in managers of the Adult Entertainment Establishment or in the individuals identified in the application pursuant to Paragraphs 6.C.1 or 6.C.2 of this Ordinance; or (ii) if any of the events constituting grounds for suspension or revocation pursuant to Subsection 17.A of this Ordinance occur.

*Section 11. Regulations Applicable To All Adult Entertainment Establishments.*

A. *General Compliance.* All Licensed Premises and Adult Entertainment Establishments shall comply with the provisions of this Ordinance; all other applicable Village ordinances, resolutions, rules, and regulations; and all other applicable federal, state, and local laws.

B. *Hours of Operation.* No Adult Entertainment Establishment shall be open for business at any time between the hours of 12:00 a.m. and 12:00 noon on any weekday or Saturday. No Adult Entertainment Establishment shall be open for business at any time on any Sunday or on any legal State of Illinois or federal holiday.

C. *Animals.* No animals, except only for seeing-eye dogs required to assist the blind, shall be permitted at any time at or in any Adult Entertainment Establishment or Licensed Premises.

D. *Restrooms.* All restrooms in Adult Entertainment Establishments shall be equipped with standard toilets, sinks, and other traditional lavatory facilities. No Adult Materials or live

performances shall be provided or allowed at any time in the restrooms of an Adult Entertainment Establishment. Separate male and female restrooms shall be provided for and used by Adult Establishment Employees and Adult Establishment Patrons.

E. *Restricted Access.* No Adult Establishment Patron shall be permitted at any time to enter into any of the non-public portions of any Adult Entertainment Establishment, including specifically, but without limitation, any storage areas or dressing or other rooms provided for the benefit of Adult Establishment Employees. This subsection shall not apply to persons delivering goods and materials, food and beverages, or performing maintenance or repairs to the Licensed Premises; provided, however, that any such persons shall remain in such non-public areas only for the purposes and to the extent and time necessary to perform their job duties.

F. *Specific Prohibited Acts.*

1. No Adult Establishment Employee or any other person at any Adult Entertainment Establishment shall appear, be present, or perform while Nude.

2. No Adult Establishment Employee or any other person at any Adult Entertainment Establishment shall perform or conduct any Specified Sexual Activity with or for any Adult Establishment Patron or any other Adult Establishment Employee or any other person. No Adult Establishment Patron or any other person at any Adult Entertainment Establishment shall perform or conduct any Specified Sexual Activity with or for any Adult Establishment Employee or any other Adult Establishment Patron or any other person.

3. Straddle Dances shall be prohibited at all Adult Entertainment Establishments.

G. *Exterior Display.* No Adult Entertainment Establishment shall be maintained or operated in any manner that causes, creates, or allows public viewing of any Adult Material, or any entertainment depicting, describing, or relating to Specified Sexual Activities or Specified Anatomical Areas, from any sidewalk, public or private right-of-way, or any property other than the lot on which the Licensed Premises is located. No portion of the exterior of an Adult Entertainment Establishment shall utilize or contain any flashing lights, search lights, or spotlights, or any other similar lighting systems, or any words, lettering, photographs, silhouettes, drawings, or pictorial representations of any manner except to the extent specifically allowed pursuant to Subsection 1 of this Section with regard to signs. This Subsection shall apply to any advertisement, display, promotional material, decoration, or sign; to any performance or show; and to any window, door, or other opening.

H. *Signage Limitations.* All signs for Adult Entertainment Establishments shall be flat wall signs. The maximum allowable sign area shall be one square foot of sign area per foot of lot frontage on a street, but in no event exceeding 32 square feet. The maximum number of signs shall be one per lot frontage. Signs otherwise permitted pursuant to this Ordinance shall contain only (i) the name of the Adult Entertainment Establishment and/or (ii) the specific type of Adult Entertainment Establishment conducted on the Licensed Premises. Temporary signage shall not be permitted in connection with any Adult Entertainment Establishment.

I. *Noise.* No loudspeakers or sound equipment audible beyond the Licensed Premises shall be used at any time.

J. *Gambling and Related Devices Prohibited.* No Adult Entertainment Establishment shall contain any video,

pinball, slot, bagatelle, pigeon-hole, pool, or any other games, machines, tables, or implements.

K. *Manager's Station.* Each Adult Entertainment Establishment shall have one or more manager's stations. The interior of each Adult Entertainment Establishment shall be configured in such a manner that there is a direct and substantially unobstructed view from at least one manager's station to every part of each area, except restrooms, of the Establishment to which any Adult Establishment Patron is permitted access for any purpose.

L. *Alcohol Prohibition.* No alcoholic liquor of any kind shall be sold, used, consumed, or possessed at any time on any Licensed Premises or at any Adult Entertainment Establishment.

*Section 12. Special Regulations For Adult Booths.*

A. *Prohibited Except in Adult Stores.* Adult Booths shall be prohibited in all Adult Entertainment Establishments except Adult Stores.

B. *Occupancy and Prohibited Acts.* Only one individual shall occupy an Adult Booth at any one time. No individual occupying an Adult Booth shall engage in any Specified Sexual Activities. No individual shall damage or deface any portion of an Adult Booth.

C. *Open Booth Requirement.* In addition to satisfying the manager station requirements of Subsection 11.K of this Ordinance, all Adult Stores containing Adult Booths shall be physically arranged in such a manner that the entire interior portion of each Adult Booth shall be visible from the common area of the Adult Store. To satisfy this requirement, there shall be a permanently open and unobstructed for each Adult Booth and for the entranceway from the area of the Adult Store that provides other Adult Materials to the area of the Adult Store containing the Adult Booths. Each of these entrance ways shall not be capable of being closed or obstructed, entirely or partially, by any door, curtain, partition, drapes, or any other obstruction whatsoever that would be capable of wholly or partially obscuring the area of the Adult Store containing the Adult Booths or any person situated in an Adult Booth. It shall be unlawful to install Adult Booths within an Adult Entertainment Establishment for the purpose of providing secluded viewing of Adult Materials or live performances.

D. *Aisle Required.* There shall be one continuous lighted main aisle along side the Adult Booths provided in any Adult Store. Each person situated in a Booth shall be visible at all times from the aisle.

E. *Holes Prohibited.* Except for the open Booth entranceway, the walls and partitions of each Adult Booth shall be constructed and maintained of solid walls or partitions without any holes or openings whatsoever.

F. *Signage.* A sign shall be posted in a conspicuous place at or near the entranceway to each Adult Booth that states (i) that only one person is allowed in an Adult Booth at any one time, (ii) that it is unlawful to engage in any Specified Sexual Activities while in an Adult Booth, and (iii) that it is unlawful to damage or deface any portion of an Adult Booth.

G. *Age Limitations.*

1. No Adult Establishment Employee or Adult Establishment Patron at an Adult Booth or a Licensed Premises that includes an Adult Booth shall be under the age of 18.

2. No person under the age of 18 shall be admitted to any Adult Booth or any Licensed Premises that includes and Adult Booth.

3. No person under the age of 18 shall be allowed or permitted to remain at any Adult Booth or at any Licensed

Premises that includes an Adult Booth.

4. No person under the age of 18 shall be allowed or permitted to purchase or receive, whether for consideration or not, any Adult Material or other goods or services at or from any Adult Booth or any Licensed Premises that includes an Adult Booth.

*Section 13. Special Regulations For Adult Cabarets.*

A. *Performance Area.* The performance area of an Adult Cabaret shall be limited to one or more stages or platforms permanently anchored to the floor (a "Cabaret Stage"). Each Cabaret Stage shall be at least 18 inches in elevation above the level of the patron seating areas. Each Cabaret Stage shall be separated by a distance of at least eight feet from all areas of the premises to which Adult Entertainment Patrons have access. A continuous barrier at least three feet in height and located at least eight feet from all points of each Cabaret Stage shall separate each Cabaret Stage from all patron seating areas. The barrier shall consist of horizontal or vertical members spaced no more than nine inches apart and nine inches from the floor or the walls to which it is attached.

B. *Lighting.* Sufficient lighting shall be provided and equally distributed throughout the public areas of the Adult Cabaret so that all objects are plainly visible at all times. A minimum lighting level of not less than 30 lux horizontal, measured at 30 inches from the floor and on 10–foot centers shall be maintained at all times for all areas of the Adult Cabaret where Adult Establishment Patrons are admitted.

C. *Tipping.* No tip or gratuity from any Adult Establishment Patron may be offered or accepted for any performance by an Adult Establishment Employee on any Adult Cabaret Stage at any time prior to the completion of any such performance. No Adult Establishment Patron shall offer, and no Adult Establishment Employee having performed on any Cabaret Stage shall accept, any form of tip or gratuity offered directly to the Employee by the Adult Establishment Patron. Rather, following completion of a performance, all tips and gratuities to Adult Establishment Employees performing on any Cabaret Stage shall be placed into a receptacle provided for receipt of such tips and gratuities by the Adult Entertainment Establishment.

D. *Notice of Select Rules.* A sign at least two feet by two feet, with letters at least one inch high shall be conspicuously displayed on or adjacent to every Cabaret Stage stating the following:

THIS ADULT CABARET IS REGULATED BY THE VILLAGE OF MAPLETON ENTERTAINERS ARE:

1. NOT PERMITTED TO ENGAGE IN ANY TYPE OF SEXUAL CONDUCT.

2. NOT PERMITTED TO APPEAR IN A STATE OF NUDITY.

3. NOT PERMITTED TO ACCEPT TIPS OR GRATUITIES FOR ANY PERFORMANCE UNTIL AFTER COMPLETION OF THE PERFORMANCE.

4. NOT PERMITTED TO ACCEPT ANY TIPS DIRECTLY FROM PATRONS EVEN AFTER COMPLETION OF THE PERFORMANCE. ANY SUCH TIPS MUST BE PLACED INTO THE RECEPTACLE PROVIDED BY MANAGEMENT.

E. *Age Limitations.*

1. No Adult Establishment Employee or Adult Establishment Patron at an Adult Cabaret or a Licensed Premises used for an Adult Cabaret shall be under the age of 21.

2. No person under the age of 21 shall be admitted to any Adult Cabaret or to any Licensed Premises used for an Adult Cabaret.

3. No person under the age of 21 shall be allowed or permitted to remain at any Adult Cabaret or any Licensed Premises used for an Adult Cabaret.

4. No person under the age of 21 shall be allowed or permitted to purchase or receive, whether for consideration or not, any Adult Material or other goods or services at or from any Adult Cabaret or any Licensed Premises used for an Adult Cabaret.

*Section 14. Special Regulation For Adult Stores.*

A. *Windows and Signs.* Window areas for Adult Stores shall not be covered or obstructed in any way. No signs or other obstructions shall be placed in the windows.

B. *Age Limitations.*

1. No Adult Establishment Employee or Adult Establishment Patron at an Adult Store or a Licensed Premises used for an Adult Store shall be under the age of 18.

2. No person under the age of 18 shall be admitted to any Adult Store or to any Licensed Premises used for an Adult Store.

3. No person under the age of 18 shall be allowed or permitted to remain at any Adult Store or any Licensed Premises used for an Adult Store.

4. No person under the age of 18 shall be allowed or permitted to purchase or receive, whether for consideration or not, any Adult Material or other goods or services at or from any Adult Store or any Licensed Premises used for an Adult Store.

*Section 15. Special Regulations For Adult Theaters.*

A. *Seating.* Each Adult Theater shall provide seating only in individual chairs with arms or in seats separated from each other by immovable arms and not on couches, benches, or any other multiple person seating structures. The number of seats shall equal the maximum number of persons who may occupy the Adult Theater.

B. *Aisle.* Each Adult Theater shall have a continuous main aisle alongside the seating area in order that each person seated in the Adult Theater shall be visible from the aisle at all times.

C. *Sign.* Each Adult Theater shall have a sign posted in a conspicuous place at or near each entranceway to the auditorium or similar area that lists the maximum number of persons who may occupy the auditorium area, which number shall not exceed the number of seats in the auditorium area.

D. *Age Limitations.*

1. No Adult Establishment Employee or Adult Establishment Patron at an Adult Theater or a Licensed Premises used for an Adult Theater shall be under the age of 18.

2. No person under the age of 18 shall be admitted to any Adult Theater or to any Licensed Premises used for an Adult Theater.

3. No person under the age of 18 shall be allowed or permitted to remain at any Adult Theater or any Licensed Premises used for an Adult Theater.

4. No person under the age of 18 shall be allowed or permitted to purchase or receive, whether for consideration or not, any Adult Material or other goods or services at or from any Adult Theater or any Licensed Premises used for an Adult Theater.

*Section 16. Licensee Responsibility For Employees.*

Every act or omission by an Adult Establishment Employee constituting a violation of the provisions of this Ordinance shall be deemed to be the act or omission of the Licensee if such act or omission occurs either with the authorization, knowledge,

or approval of the Licensee, or as a result of the Licensee's negligent failure to supervise the Adult Establishment Employee. The Licensee shall be punishable for any such act or omission in the same manner as if the Licensee committed the act or caused the omission. Accordingly, any such act or omission of any such Employee constituting a violation of the provisions of this Ordinance shall be deemed, for purposes of determining whether the Licensee's Adult Establishment License shall be revoked, suspended, or renewed, to be the act or omission of the Licensee.

*Section 17. License Revocation or Suspension.*

A. *Grounds.* Pursuant to the procedures set forth in Subsection B of this Section, the Adult Use Commissioner may suspend for not more than 30 days, or revoke, any Adult Establishment License if the Adult Use Commissioner, based on credible and reasonably reliable information and evidence, determines that any one or more of the following has occurred:

 1. The Licensee has violated any of the provisions or requirements of this Ordinance or the Adult Establishment License issued pursuant hereto, or the provisions of the Zoning Ordinance applicable to the Licensed Premises or the Adult Entertainment Establishment.

 2. The Licensee (i) knowingly or negligently furnished false or misleading information or withheld information on any application or other document submitted to the Village for the issuance or renewal of any Adult Establishment License or (ii) knowingly or negligently caused or suffered any other person to furnish or withhold any such information on the Licensee's behalf.

 3. The Licensee has been convicted of, or pleaded *nolo contendere* to, a felony or Specified Criminal Act on the Licensed Premises.

 4. The Licensee authorizes, approves, or, as a result of the Licensee's negligent failure to supervise the Licensed Premises or the Adult Entertainment Establishment, allows, an Adult Establishment Employee, an Adult Establishment Patron, or any other person to (i) violate any of the provisions or requirements of this Ordinance or of the provisions or requirements of the Adult Establishment License issued pursuant hereto, or (ii) commit any felony or Specified Criminal Act on the Licensed Premises.

 5. The Licensee, or any person identified pursuant to Paragraphs 6.C.1, 6.C.2, or 6.C.14 of this Ordinance becomes disqualified for the issuance of an Adult Establishment License at any time during the term of the License at issue.

B. *Procedure.* An Adult Entertainment Establishment License may be suspended for not more than 30 days or revoked pursuant to the terms and conditions set forth in this Subsection B.

 1. Notice. Upon determining that one or more of the grounds for suspension or revocation under Subsection A of this Section may exist, the Adult Use Commissioner shall serve a written notice on the Licensee in person or by certified U.S. mail, postage prepaid, return receipt requested, addressed to the Licensee's address as set forth in the Licensee's application. The written notice shall, at a minimum, (i) state that Adult Use Commissioner has determined that the Adult Establishment License may be subject to suspension or revocation pursuant to Subsection 17.A of this Ordinance; (ii) identify the specific grounds for the Adult Use Commissioner's determination; and (iii) set a date for a hearing regarding the Adult Use Commissioner's determination as to

the possibility of suspension or revocation of the Adult Establishment License. The date of the hearing shall be no less than five days after service of the Adult Use Commissioner's notice, unless an earlier or later date is agreed to by the Licensee and the Adult Use Commissioner.

2. Hearing. The hearing shall be conducted by the Adult Use Commissioner, or, at the Adult Use Commissioner's direction, by the Adult Use Commission. At the hearing, the Licensee may present and submit evidence and witnesses to refute the grounds cited by the Adult Use Commissioner for suspending or revoking the License and the Village and any other persons may submit evidence to sustain such grounds. The administrative record compiled on the Adult Entertainment Establishment pursuant to Section 18 of this Ordinance shall be made part of the hearing record. Within three days after the close of the hearing, the Adult Use Commissioner shall, having considered the record made at the hearing, render a decision in writing, setting forth the reasons for the decision. The action taken by the Adult Use Commissioner shall be final and shall be subject to judicial review.

3. Notice and Effective Date of Suspension or Revocation. The Adult Use Commissioner's written decision shall be posted at the office of the Adult Use Commissioner and shall be served on the Licensee in person or by certified U.S. mail, postage prepaid, return receipt requested, addressed to the Licensee's address as set forth in the Licensee's application. Any suspension or revocation, as the case may be, shall take effect on the day that the Adult Use Commissioner's written decision is delivered in person or three days after it is placed in the U.S. mail as provided in this paragraph.

4. Surrender of License and Security. Upon the suspension or revocation of an Adult Establishment License pursuant to this Ordinance, (i) the Adult Use Commissioner shall take custody of the suspended or revoked License; and (ii) such part or all of the bond or other security submitted for the Adult Entertainment Establishment pursuant to Paragraph 6.B.2 of this Ordinance shall be forfeited as the Adult Use Commissioner shall deem necessary to reimburse the Village for the costs associated with the proceedings related to the suspension or revocation at issue. Such bond or other security shall be replenished to equal the amount required pursuant to Paragraph 6.B.2 of this Ordinance prior to the issuance of any new Adult Establishment License for the Licensed Premises or for the reinstatement of any suspended License.

## Section 18. Administrative Record.

The Adult Use Commissioner shall cause to be kept in the Adult Use Commissioner's office an accurate record of every Adult Establishment License application received and acted on, together with all relevant information and material pertaining to such application, any Adult Establishment License issued pursuant thereto, and any Adult Entertainment Establishment operated pursuant to such Adult Establishment License.

## Section 19. Recordkeeping by Licensee.

The Licensee of every Adult Entertainment Establishment shall maintain a register of all of its Adult Establishment Employees. For each such Employee, the register shall include the following information:

1. Legal name.

2. Any and all aliases.

3. Current residential address and telephone number.

4. Date of birth.
5. Gender.
6. Social security number.
7. Date of commencement of employment.
8. Date of employment termination, if applicable.
9. Specific job or employment duties.

The register shall be maintained for all current employees and all employees employed at any time during the preceding 36 months. The Licensee shall make the register of its Adult Establishment Employees available for inspection by the Village immediately upon demand at all reasonable times.

## Section 20. Penalty.

Any person who violates, neglects, refuses to comply with, or assists or participates in any way in the violation of, any of the provisions or requirements of this Ordinance or of any of the provisions or requirements of any Adult Establishment License, shall be fined not more than $500 for each such violation. Each day such violation continues shall constitute a separate offense. The Adult Use Commissioner shall give written notice to any such person of any such violation and the fine imposed by serving a citation in person or by certified U.S. mail, postage prepaid, return receipt requested, addressed to the Licensee's address as set forth in the Licensee's application.

## Section 21. Nuisance Declared.

Any Adult Entertainment Establishment established, operated, or maintained in violation of any of the provisions or requirements of this Ordinance or of any Adult Establishment License shall be, and the same is, declared to be unlawful and a public nuisance. The Village may, in addition to or in lieu of any other remedies set forth in this Ordinance, commence an action to enjoin, remove, or abate such nuisance in the manner provided by law and shall take such other steps and apply to such court or courts as may have jurisdiction to grant such relief as will abate or remove such public nuisance, and restrain and enjoin any person from establishing, operating, or maintaining an Adult Entertainment Establishment contrary to the provisions of this Ordinance.

## Section 22. Computation of Time.

Unless otherwise specifically set forth in this Ordinance, the time within which any act required by this Ordinance is to be done shall be computed by excluding the first day and including the last day, unless the last day is Saturday, Sunday or a Federal or State of Illinois holiday, in which case it shall also be excluded. If the day immediately following such Saturday, Sunday, or holiday is also a Saturday, Sunday, or holiday, then such succeeding day shall also be excluded.

## Section 23. Severability.

In the event that any provision of this Ordinance, or any part thereof, or any application thereof to any person or circumstance, is for any reason held to be unconstitutional or otherwise invalid or ineffective by any court of competent jurisdiction on its face or as applied, such holding shall not affect the validity or effectiveness of any of the remaining provisions of this Ordinance, or any part thereof, or any application thereof to any person or circumstance or of said provision as applied to any other person or circumstance. It is hereby declared to be the legislative intent of the Village that this Ordinance would have been adopted had such unconstitutional, invalid, or ineffective provisions not been included herein.

## Section 24. Effective Date.

This Ordinance shall be in full force and effect from and after its passage, approval and publication as provided by law.

PASSED AND ADOPTED by the President and Board of Trustees of the Village of Mapleton, Peoria County, Illinois, this 3rd day of August 1998.

/s/ Ken Odewalt

Village President

Recorded in the Village Ordinance Record on Aug. 3, 1998.